RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 12a0314p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

_____

ALFRED CLEVELAND,

> *Petitioner-Appellant,*

> *v.*

> No. 11-3162

MARGARET BRADSHAW,

> *Respondent-Appellee.*

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 1:10-cv-148—Jack Zouhary, District Judge.

Argued: May 29, 2012

Decided and Filed: September 10, 2012

Before: MARTIN, GILMAN, and WHITE, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Jennifer Paschen Bergeron, OHIO INNOCENCE PROJECT, Cincinnati, Ohio, for Appellant. Jerri L. Fosnaught, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee. **ON BRIEF:** Jennifer Paschen Bergeron, OHIO INNOCENCE PROJECT, Cincinnati, Ohio, for Appellant. Jerri L. Fosnaught, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

_____

**OPINION**

_____

HELENE N. WHITE, Circuit Judge. Petitioner Alfred Cleveland is currently serving a term of life imprisonment for the 1991 murder of Marsha Blakely. On January 21, 2010, Cleveland filed a habeas petition in the United States District Court for the

Northern District of Ohio asserting six claims for relief.[1]  Although Cleveland did not file his habeas petition within the applicable limitations period, he argued that his "actual innocence" of the crime mandated equitable tolling of the limitations period and that the discovery of a new factual predicate for his habeas claims entitled him to statutory tolling under 28 U.S.C. § 2244(d).  The district court disagreed and dismissed the petition as untimely without reviewing the merits of the underlying claims.  On appeal, Cleveland argues that the district court erred in not finding him entitled to statutory and equitable tolling and seeks remand of his habeas petition for review on the merits.  For the reasons set forth below, we reverse.

## I.

The following facts are taken from the Ohio Court of Appeals decision denying Cleveland's direct appeal:

> Marsha Blakely's body was discovered in an alley in Lorain during the summer of 1991.  She had fractured ribs and a broken neck.  Her throat had also been cut, and she had torture-type wounds on the side of her neck and head.  A witness to the murder eventually came forward, describing in detail the events of that fateful night.  The witness' statement implicated the group of men responsible, one of whom was Defendant.  Defendant was indicted for the aggravated murder of Ms. Blakely.  He was arrested and arraigned in May of 1995.
>
> ...
> Trial began as scheduled.  It lasted six days, and included the foregoing witness' testimony explaining Defendant's participation in the death of Ms. Blakely.
> ...
> After two days of deliberations, Defendant was found guilty as charged in the indictment.

Although Cleveland was charged with Blakely's murder only, another person, Floyd Epps, was murdered on the same night as Blakely and the police believed the

---

[1]Petitioner's six habeas claims are: 1) he is actually innocent of Blakely's murder; 2) his due process rights were violated when the State presented testimony that it knew, or should have known, was false; 3) his due process rights were violated when the State failed to disclose favorable evidence; 4) his substantive and procedural due process rights to a fair trial were violated by the prosecutor's misconduct; 5) ineffective assistance of trial counsel; and 6) ineffective assistance of appellate counsel.

murders were related. Epps's body was discovered at approximately 1:25 a.m. on August 8, 1991, and Blakely's body was discovered almost eight hours later at approximately 9:18 a.m. After the police investigation into these murders stalled, the Lorain County prosecutor offered a $2,000 reward. In response, William Avery, Sr. ("Sr."), a longtime police informant, contacted the police on September 10, 1991, with information about the murders. The police informed Sr. that the reward would be given only to someone with firsthand information. The following day, Sr. brought his son, William Avery, Jr., to the police and informed them that Avery had firsthand information to provide. Avery then implicated four persons in Blakely's murder – Lenworth Edwards, Benson Davis, John Edwards, and Cleveland. According to Avery, all four men were drug dealers from New York who came to Lorain, Ohio to sell crack-cocaine. Avery informed the police that he owed Cleveland money for drugs and that he had offered to assault someone to pay off the debt. Cleveland then took Avery to Epps's apartment and told Avery to assault Blakely, who was there at the time. However, Avery refused to assault Blakely because he knew her personally. Avery and Cleveland then watched while Edwards, Davis, and John Edwards assaulted Blakely for twenty minutes. Avery told the police that although he was present only at the assault, Cleveland came to his apartment an hour or two after the assault and told him, "We took care of the junkie, we knocked her off."

As a result of providing the above information, Avery received the $2,000 reward, an additional $2,000-$3,000 for his deposition testimony, and a relocation stipend.

The State tried Edwards first in 1991. At the behest of Sr., Avery demanded $10,000 more from the prosecutor for his trial testimony. When the prosecutor refused, Avery refused to testify at the trial. The court then put Avery in jail for contempt. At some point, Avery returned to court and testified under oath that he had lied about witnessing any acts involving Blakely. This resulted in a mistrial and Avery's imprisonment for perjury. While in jail, Avery decided to withdraw his recantation and again state that Cleveland, Edwards, Davis, and John Edwards were involved in

Blakely's murder. At this time, Avery also informed the prosecutor for the first time that instead of going home after Blakely's assault, as he previously stated he did, he went with all four defendants and Blakely to the back of a shopping plaza where he saw a fifth male, known as "Justice," repeatedly beat Blakely with a shiny object.

During Edwards's retrial, Avery testified that he had lied about not being a witness during Edwards's first trial and that he had seen part of the second assault that eventually caused Blakely's death before he ran away. Avery repeated this version of events at the trials of Davis, Cleveland, and John Edwards, who was tried last. During Cleveland's trial, Avery explained that he had recanted his testimony in Edwards's first trial because he had been threatened by Edwards while in the county jail for his contempt charge. Avery also admitted on cross-examination that he had lied to the police on at least two occasions regarding what he witnessed that night.

Cleveland maintained his innocence throughout the trial and presented several witnesses who testified that he was in New York throughout the week of August 5-12, 1991. Based on evidence that Cleveland had met with his probation officer on the morning of August 7, 1991, the government conceded Cleveland's presence in New York at that time. Cleveland also presented evidence that he was in New York at approximately 10 a.m. on August 8, 1991, the morning Blakely's body was discovered. Nonetheless, the jury convicted Cleveland of aggravated murder on January 31, 1996.

The court sentenced Cleveland to life imprisonment with the possibility of parole after twenty years. Cleveland filed a timely appeal to the Ohio Court of Appeals on February 27, 1996. The Ohio Court of Appeals affirmed Cleveland's conviction on March 6, 1997. Cleveland filed a pro se notice of appeal and a motion for leave to file a delayed appeal to the Ohio Supreme Court on May 9, 1997, which the Ohio Supreme Court denied on July 2, 1997. On July 15, 1997, Cleveland filed a delayed application to re-open his appeal in the Ohio Court of Appeals to assert a claim of ineffective assistance of appellate counsel. The Ohio Court of Appeals dismissed Cleveland's application as untimely on July 29, 1997. Cleveland then filed a timely appeal to the

Ohio Supreme Court on September 8, 1997 and, on November 12, 1997, that court dismissed his appeal as not involving any substantial constitutional question.

In the interim, on December 3, 1996, Cleveland filed a motion for a new trial in state court  and a motion for leave to file a delayed motion for a new trial based on an affidavit from Jeremiah Abdullah Charlton.  Abdullah attested in his affidavit that Cleveland was not involved in the murder and that Abdullah had tried to inform law enforcement and the prosecutor of this fact prior to trial.  Abdullah further declared that Avery stated that he had fabricated the story about the four defendants' involvement in Blakely's murder.  The court held a hearing on June 9, 1997, but denied the motion for a new trial because Cleveland produced no evidence at the hearing in support of his motion.  Cleveland filed a timely appeal to the Ohio Court of Appeals on July 8, 1997, and that court affirmed the trial court's decision on April 8, 1998.

Between 1998 and 2006, Cleveland searched for Avery.  Cleveland's family hired a private investigator, Martin Yant, who located Avery in 1998.  However, Avery fled when Yant and Cleveland's wife attempted to meet with him to discuss the case. Students from the Innocence Project at Northwestern University also hired a private investigator who unsuccessfully searched for Avery for two years.

On November 24, 2004, Avery, unbeknownst to Cleveland, contacted FBI Agent William Beachum and informed him that he had lied during the trials of Cleveland and the other defendants.  Avery also informed Agent Beachum that Avery's father had committed the murders and that Sr. had pressured Avery to come forward so that Sr. could collect the reward money and cover up his guilt.  This information was not communicated to Cleveland.

Cleveland's wife learned that Avery was in Detroit in late 2005 and traveled there to find him but was unsuccessful.  Cleveland's father then went to Detroit in January 2006 and informed Avery's mother that he wanted to speak with Avery.  Avery called Cleveland's father a week later and said that he would meet with Cleveland's attorney, Bruce Ellison, and private investigator, Paul Ciolino.  Avery then spoke with

Ellison telephonically and admitted that he had lied during Cleveland's trial. Ellison informed Cleveland of this fact during a jailhouse conversation on February 5, 2006.

On February 9, 2006, Avery met with Ellison and Ciolino and signed an affidavit recanting his trial testimony. In this affidavit, Avery also averred that during Edwards's trial he informed the prosecutor that his earlier statements about witnessing the murder were false but the prosecutor told him, "[I]f these dudes don't go down for this, that [Avery] would." Avery met with Ellison and Ciolino again on April 4, 2006, this time with a court reporter present, and provided a sworn statement of recantation with additional details. Avery claimed that he was now recanting because he had quit using drugs, had a full-time job, and was trying "to get [his] life straight with God." Avery also claimed that after informing his mother about his 2004 conversation with the FBI, she told him that he needed to come forward and tell the truth. However, at no point during Avery's conversations with Cleveland's counsel did Avery repeat the detail he had stated previously that his father had actually committed the murders.

On July 6, 2006, Cleveland filed a Petition for Post-Conviction Relief, a motion for leave to file a motion for a new trial, and a motion to hold Ohio Revised Code § 2953.12 unconstitutional, all in the Lorain County Court of Common Pleas. On January 29, 2008, the court denied all of Cleveland's claims as untimely, except for those pertaining to Avery's recantation, and scheduled an evidentiary hearing. During the hearing on January 31, 2008, Avery appeared and informed the court that he desired to recant his trial testimony. The court appointed a local attorney to advise Avery of the legal consequences of recanting. The court also informed Avery that upon recanting he may be subject to prosecution for perjury at the trials of Cleveland and the other defendants and offered Avery an opportunity to speak with the appointed attorney outside of the courtroom. Avery took advantage of this opportunity and informed the court upon his return that he still wished to recant. The prosecutor next asked the court to read Avery his Miranda rights, which the court did. Afterwards, the court asked Avery if he wanted to speak with his attorney again. Avery's attorney then informed him that he could receive anywhere from 20 to 30 years in prison on the multiple perjury

counts.  Following that conversation, Avery's counsel asked the prosecutor if he would grant Avery immunity from perjury charges.  When the prosecutor refused, Avery invoked his Fifth Amendment right not to testify.  Cleveland's counsel asked that Avery be given the opportunity to think the matter over during the lunch break, but after the break Avery still refused to testify.  Avery told a reporter after the hearing that: "Dude's innocent . . . but I don't feel I have to go to jail for 30 years."

The trial court denied Cleveland's post-conviction motion on April 25, 2008. Cleveland filed a timely appeal to the Ohio Court of Appeals and that court affirmed the trial court's decision on February 2, 2009.  Cleveland then filed a timely appeal to the Ohio Supreme Court, which dismissed the appeal on June 17, 2009 as not involving any substantial constitutional question.

Cleveland filed the instant habeas petition on January 21, 2010.  The magistrate judge issued a Report that recommended all claims be dismissed as untimely, which the district court adopted on January 14, 2011.  Although the district court denied Cleveland a Certificate of Appealability, this court granted Cleveland a Certificate of Appealability on the issues whether he is entitled to statutory or equitable tolling.

## II.

This court reviews the district court's grant or denial of a habeas petition de novo.  *Souter v. Jones*, 395 F.3d 577, 584 (6th Cir. 2005).

The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") provides a one-year statute of limitations for filing a federal habeas petition.  Under 28 U.S.C. § 2244(d)(1):

the one-year limitation period shall run from the latest of—

(A) the date on which the judgment became final by the conclusion of direct review or the expiration of the time for seeking such review;
(B) the date on which the impediment to filing an application created by State action in violation by the Constitution or laws of the United States is removed, if the applicant was prevented from filing by such State action;

(C) the date on which the constitutional right asserted was initially recognized by the Supreme Court, if the right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review;
or
(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

Respondent filed a motion to dismiss Cleveland's claims as untimely on the basis that the one-year statute of limitations began to run forty-five days after the Ohio Court of Appeals affirmed the denial of Cleveland's motion for a new trial on April 8, 1998. *See* 28 U.S.C. § 2244(d)(1)(A). Under this calculation, the limitations period expired on May 23, 1999, and the instant petition, filed over a decade later, is untimely.

Cleveland argues that he is entitled to equitable tolling of AEDPA's limitations period based on the Supreme Court's decision in *Schlup v. Delo*, 513 U.S. 298 (1995), and our decision in *Souter v. Jones*, 395 F.3d 577 (6th Cir. 2005). In *Schlup*, the Supreme Court held that a petitioner who asserts a credible claim of actual innocence can "avoid a procedural bar to the consideration of the merits of his constitutional claims." 513 U.S. 298, 327 (1995). Based on *Schlup*, we have held that a petitioner who presents a credible claim of actual innocence is entitled to equitable tolling of AEDPA's statute of limitations. *Souter*, 395 F.3d at 601.[2] This does not mean, however, that such a petitioner is automatically entitled to habeas relief. In *Schlup*, the Court distinguished habeas petitions asserting claims of actual innocence in cases where no constitutional error is alleged, as in *Herrera v. Collins*, 506 U.S. 390 (1993), from petitions in cases where a constitutional error allegedly occurred, *Schlup*, 513 U.S. at 314-15 (1995). The petitioner in the latter scenario does not argue that his innocence entitles him to habeas relief, but rather that his innocence entitles him to have a federal court consider the

---

[2]In *Holland v. Florida*, 130 S.Ct. 2549 (2010), the Supreme Court reiterated that equitable tolling based on attorney error is available only when a petitioner shows: "(1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way" and prevented timely filing. *Id.* at 2562 (2010) (citing *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)). We recently explained in *Perkins v. McQuiggin*, 670 F.3d 665 (6th Cir. 2012), that the *Holland* decision did not alter our analysis in *Souter* and a petitioner claiming actual innocence (as opposed to attorney error) did not need to demonstrate reasonable diligence to be entitled to equitable tolling. 670 F.3d at 672-73, 676.

merits of his constitutional claims despite a procedural bar that would ordinarily preclude such review. *Id.* at 315. In that case, a credible claim of actual innocence only operates as a "gateway" through which a petitioner may pass and obtain federal review of his claims. *Id.* Accordingly, where a petitioner's claim of actual innocence is for the purpose of having the court determine whether the constitutional errors alleged in the habeas petition warrant relief, the petitioner is required to meet a less stringent standard than in cases where the petitioner seeks habeas relief solely on the basis of his claimed innocence. *Id.* at 316. The Supreme Court explained the difference between the two situations as follows:

> If there were no question about the fairness of the criminal trial, a *Herrera*-type claim would have to fail unless the federal habeas court is itself convinced that those new facts unquestionably establish [the petitioner's] innocence. On the other hand, if the habeas court were merely convinced that those new facts raised sufficient doubt about [the petitioner's] guilt to undermine confidence in the result of the trial without the assurance that trial was untainted by constitutional error, [the petitioner's] threshold showing of innocence would justify a review of the merits of the constitutional claims.

*Id.* at 317.

The Eighth Circuit concluded that the petitioner in *Schlup* could not obtain review of his procedurally barred claims because he did not satisfy the standard set forth in *Sawyer v. Whitley*, 505 U.S. 333 (1992). To obtain review under the *Sawyer* standard, a habeas petitioner was required to show "by clear and convincing evidence that, but for a constitutional error, no reasonable juror would have found the petitioner [guilty]." *Id.* at 336. The Supreme Court granted certiorari to determine whether the *Sawyer* standard was the proper one to apply in this situation. The Court held that the standard set forth in *Murray v. Carrier*, 477 U.S. 478 (1986), which requires a petitioner to "show that it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt," rather than the *Sawyer* standard, applied. *Schlup*, 513 U.S. 298, 327 (1995). In support of its holding that a lower burden of proof was more appropriate, the Court emphasized a fundamental principle of American society that it is better to let a guilty man go free than to convict an innocent man. *Id.* at 325.

Although the Court recognized "that a substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare," *id.* at 323, the *Carrier* standard nonetheless struck the appropriate balance between ensuring that a petitioner's ability to overcome a procedural bar by establishing a credible claim of actual innocence remains "extraordinary," and "still providing petitioner a meaningful avenue by which to avoid a manifest injustice," *id.* at 327.

To proceed through the *Schlup* gateway a petitioner must present a "credible" claim of actual innocence. This "requires petitioner to support his allegations of constitutional error with new reliable evidence — whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence that was not presented at trial." *Id.* at 324. The Court explained the proper review that lower courts should undertake in this situation:

> The *Carrier* standard is intended to focus the inquiry on actual innocence. In assessing the adequacy of petitioner's showing, therefore, the district court is not bound by the rules of admissibility that would govern at trial. Instead, the emphasis on "actual innocence" allows the reviewing tribunal also to consider the probative force of relevant evidence that was either excluded or unavailable at trial . . . .The habeas court must make its determination concerning the petitioner's innocence "in light of all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial."

*Id.* at 327-38 (citations omitted).

In this circumstance, actual innocence "does not merely require a showing that a reasonable doubt exists in the light of the new evidence, but rather that no reasonable juror would have found the defendant guilty." *Id.* at 329. This standard, however, is less strict than the insufficient evidence standard outlined in *Jackson v. Virginia*, 443 U.S. 307 (1979), which "looks to whether there is sufficient evidence which, if credited, ***could*** support the conviction," because it focuses on what a reasonable juror ***would*** do. *Id.* at 329-30 (emphasis added). The *Carrier* standard "does not require absolute certainty about the petitioner's guilt or innocence." *House v. Bell*, 547 U.S. 518, 538

(2006).   Nor is "the mere existence of sufficient evidence to convict" outcome determinative.  *Schlup*, 513 U.S. at 330.  Rather, the standard is a probabilistic one that requires a petitioner to show that upon consideration of the new evidence "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." *Schlup,* 513 U.S. at 327.  In undertaking this  probabilistic inquiry, "[i]t must be presumed that a reasonable juror would consider fairly all of the evidence presented . . . [and] would conscientiously obey the instructions of the trial court requiring proof beyond a reasonable doubt." *Id.* at 329.

## III.

There is a circuit split about whether the "new" evidence required under *Schlup* includes only newly discovered evidence that was not available at the time of trial, or broadly encompasses all evidence that was not presented to the fact-finder during trial, *i.e.,* newly presented evidence. *See Connolly v. Howes*, 304 F. App'x 412, 419 (6th Cir. 2008) (Sutton, J., concurring).  Our opinion in *Souter* suggests that this Circuit considers "newly presented" evidence sufficient. *See* 395 F.3d at 596 n.9.  However, just as Judge Sutton stated in his concurrence in *Connolly*, "we need not address . . . whether there is a meaningful difference between 'newly discovered' and 'newly presented' evidence," 304 F. App'x at 419, because the evidence Cleveland submits to demonstrate his innocence is analogous to the evidence considered "new" by the *Schlup* Court.

### A.    *Schlup v. Delo*

Although we have already discussed the legal holding in *Schlup*, an examination of the facts in *Schlup* reveals the similarity between the evidence submitted by the petitioner in that case and Cleveland here.  In *Schlup*, the Supreme Court considered whether a death-row petitioner who claimed that he was actually innocent of the crime for which he was convicted should be allowed to file a successive habeas petition alleging various constitutional trial errors, despite the procedural bar that normally prohibits such petitions.  The petitioner, Lloyd Schlup ("Lloyd"), who was imprisoned at the time of the crime, was convicted of murdering a fellow inmate.  Two other

inmates, including the person who actually stabbed and killed the victim, were also convicted. Although there was physical evidence connecting those two inmates to the crime, there was no physical evidence tying Lloyd to the murder. Two prison corrections officers testified at trial that after the inmates were released for their noon meal, one white inmate, Rodnie Stewart ("Stewart"), started walking against the flow of traffic and threw a container of steaming hot liquid into the face of a black inmate, Arthur Dade ("Dade"). Lloyd then jumped on Dade's back while another inmate, Robert O'Neal ("O'Neal"), stabbed Dade several times in the chest. Although a corrections officer, Sergeant Roger Flowers ("Flowers"), was able to apprehend Stewart during the confrontation, the other two assailants fled. While fleeing, O'Neal broke a window with his hand and threw the murder weapon out. O'Neal then headed to the prisoners' dining room.

Sergeant Flowers and another corrections officer, John Maylee ("Maylee"), identified Lloyd as the third assailant. No other witnesses identified Lloyd as being involved in Dade's murder.

During his trial, Lloyd relied on a videotape of the prisoners' dining room to prove his innocence. That tape showed that Lloyd was the first inmate to enter the dining room for the noon meal and that Lloyd was in the dining room sixty-five seconds before the prison distress call sounded regarding Dade's stabbing. In contrast, O'Neal entered the dining room after the distress call, covered in blood. Lloyd presented evidence from two other inmates who claimed they were behind Lloyd as he walked to the dining room and Lloyd had walked at a normal pace. Another corrections officer, Lieutenant Robert Faherty, testified that although he saw Lloyd yell something outside the window during his walk to the dining room, he did not see Lloyd do anything else unusual. Lloyd contended that it would have been impossible for him to walk from his cell to the dining room at a normal pace, participate in Dade's assault, and still return to the dining room sixty-five seconds before the distress call.

Lloyd's defense theory was predicated upon the assumption that the distress call happened shortly after Dade's assault began. Had that occurred, Lloyd could not have

traveled from the assault to the dining room and still arrived sixty-five seconds before the distress call.  However, the State presented testimony from the corrections officers that several minutes passed between the initiation of the assault and the distress call. The State also presented testimony from a prison investigator that, given that time-frame, Lloyd would have been able to walk, at a normal pace, from the place where the assault took place to the dining room prior to the distress call.

The jury convicted Lloyd of murder and sentenced him to death.  After exhausting his state-court remedies, Lloyd filed a *pro se* federal habeas petition that was denied.  Lloyd subsequently obtained new counsel, who filed another habeas petition over two years later.  This petition asserted claims of actual innocence, ineffective assistance of counsel, and failure by the State to disclose exculpatory evidence. Lloyd attached several affidavits to his petition from other inmates who claimed he was not involved in Dade's murder.  Two of those affidavits specifically named another inmate as the third assailant.  Another affidavit was from a black inmate who attested that: "I would not stick my neck out to help a white person under these circumstances normally, but I am willing to testify because I know Lloyd Schlup is innocent." A fourth inmate declared in his affidavit that he knew Lloyd was innocent but had "told the investigators that [he] didn't see anything because [he] didn't want to get involved."

In its response to Lloyd's petition, the State argued his claims were procedurally barred and meritless, and attached transcripts of interviews performed by prison investigators five days after Dade's murder.  One of those interviews contained a statement by inmate John Green ("Green") who stated that Sergeant Flowers told him to inform the prison base of the Dade assault shortly after it began and that he had followed those instructions.  Lloyd then filed a traverse claiming that Green's statement proved his innocence because it supported his theory that the distress call had gone out shortly after the murder while Lloyd was in the dining room.

The district court in *Schlup* concluded that affidavits from inmates that are produced after a long delay are "suspect" and did not "constitute a sufficiently persuasive showing of actual innocence" when considered against the testimony of the

two prison officers who had identified Lloyd. After the court dismissed Lloyd's petition, Lloyd moved to set aside the dismissal based on a newly obtained affidavit from Green who declared that he had witnessed Dade's murder, knew Lloyd was not involved, and had denied witnessing the murder upon questioning by prison investigators because he was afraid of being killed by the real culprits. The district court denied this motion and Lloyd appealed. While the appeals process was pending, Lloyd's counsel obtained an affidavit from Lieutenant Faherty who declared that Lloyd had been in his presence for at least two and a half minutes on his way to the dining room, walked at a leisurely pace, did not appear nervous, and was not breathing hard. Faherty also declared that he did not provide this information during Lloyd's trial because he had not been asked specific questions about his interaction with Lloyd.

In its opinion, the Supreme Court specifically referred to the aforementioned evidence — "affidavit of black inmates attesting to the innocence of a white defendant in a racially motivated killing; the affidvait of Green describing his prompt call for assistance; and the affidavit of Lieutenant Faherty describing [Lloyd's] unhurried walk to the dining room"— as "new facts" that were "particularly relevant." *Schlup*, 513 U.S. at 316-17. Although the Court remanded Lloyd's petition for consideration under the *Carrier* standard, it pointed out that if the new evidence submitted by Lloyd was reliable, no juror would have voted to convict. *Id.* at 331.

### B.    Cleveland's Additional Evidence of Actual Innocence

In the district court, Cleveland submitted four "particularly relevant" items of additional evidence that, when considered together with the record as a whole, present a compelling case for Cleveland's innocence: (1) the recantation of the only eye-witness to Blakely's murder, William Avery Jr.; (2) an affidavit from forensic scientist Larry Dehus stating that Blakely's blood was found at the Epps murder scene, which suggests that Blakely was murdered first and shortens the window of time for her death from between 12:00 a.m. and 3:00 a.m. on August 8, 1991, as previously thought, to between 12:00 a.m. and 1:25 a.m. on August 8, 1991; (3) an affidavit from David Alexander Donaphin declaring that he met with Cleveland in New York between 10:00 p.m. on

August 7, 1991, and 12:00 a.m. on August 8, 1991; and (4) flight records demonstrating that the last flight from New York City to Cleveland on August 7, 1991, departed at 10:40 p.m.

Because *Schlup* instructs that additional evidence of actual innocence must be both new and reliable before it can be considered, 513 U.S. at 324, we will examine each item separately to determine whether it satisfies these criteria.

### 1.       New Evidence

#### i.       Avery's Recanting Affidavit

The district court determined that Avery's 2006 recanting affidavit was not new evidence because Cleveland previously raised both the inconsistencies between Avery's trial testimony and pre-trial statements, as well as Avery's 1991 recantation, during his trial. The district court thus reasoned that the fact of Avery's recantation was available to Cleveland at the time of his trial.

However, the district court's analysis ignores the substantial differences between Avery's 1991 recantation and his 2006 recanting affidavit. First, the 2006 affidavit explains the reason behind Avery's withdrawal of his 1991 recantation— fear that the prosecutor would charge him with Blakely's murder. This information was not known to Cleveland at the time of his trial. Additionally, the 1991 recantation preceded Avery's claim that he witnessed the second assault that caused Blakely's death. At the time of his 1991 recantation, Avery's statements to the local police and Lorain County prosecutor only included information about the assault on Blakely in Floyd Epps's apartment; Avery had not yet changed his story to include witnessing the second assault behind the shopping plaza. Contrary to the district court's determination, Avery's 2006 recanting affidavit thus contains information that was not available to Cleveland as the time of his trial.

Moreover, in *Schlup*, the Court did not consider the availability of the additional evidence submitted by Lloyd. To the contrary, the Court noted Green's affidavit stating that, if he had been contacted before the trial, he would have informed Lloyd's attorney

that Lloyd was not involved in Dade's assault and that he (Green) called the prison base shortly after the assault. *Schlup*, 513 U.S. at 311 n.21. Under the district court's reasoning, Green's affidavit was "available" to Lloyd at the time of his trial. However, this had no effect on the Court's determination that the information contained in Green's affidavit constituted new evidence. Similarly, Avery's 2006 affidavit, which contains information that was not included in either his 1991 recantation or his 1996 testimony at Cleveland's trial, is also new evidence.

### ii.    Forensic Affidavit of Larry Dehus

Forensic scientist Larry Dehus's affidavit dated October 24, 2005, states that Blakely's blood was found on a piece of rubber collected from the Epps murder scene. Because Epps was discovered by the police several hours before Blakely, Cleveland claims that this forensic evidence demonstrates that the murders were related and that Blakely was murdered before Epps. This would shorten the time of death for Blakely from sometime between 12 a.m. and 3 a.m., as the medical examiner testified at Cleveland's trial, to between 12 a.m. and 1:25 a.m.

Neither party contends that the forensic information contained in the Dehus affidavit was either known or available to Cleveland at the time of his trial. Accordingly, this evidence is properly considered new.

### iii.    Affidavit of David Alexander Donaphin

In his July 22, 2006[3] affidavit, David Alexander Donaphin ("Donaphin") declares that on August 7, 1991 he celebrated his twenty-third birthday at a party thrown by his girlfriend in Hollis Hills, New York. The affidavit further states that the party ended after 9:00 p.m. and that between 10:00 p.m. on August 7, 1991, and 12:00 a.m. on August 8, 1991, Donaphin drove a friend to his home in Queens, New York. During the drive, Donaphin stopped in St. Albans, New York, where he ran into Cleveland, whom

---

[3]In 2001, Donaphin also gave a handwritten statement about Cleveland's whereabouts on the night of August 7, 1991 to Northwestern University students.

he had known since childhood. Donaphin then spent 15-20 minutes with Cleveland before leaving to drop off his friend.

Donaphin attests that although Investigator Yant had previously contacted him about Cleveland's case, Yant was not persistent, and Donaphin did not realize the seriousness of the situation and erroneously believed the case involved drugs rather than murder. Further, because Donaphin had never been told the date of the crime for which Cleveland was charged, he did not make the connection with his birthday.

Donaphin's affidavit is analogous to the new affidavits submitted by Lieutenant Faherty and Green in *Schlup*. Lieutenant Faherty testified at Lloyd's trial and could have provided the alibi information contained in his subsequent affidavit if asked at that time. However, Lloyd's attorney failed to make this request.[4] Likewise, Green was available to provide exculpatory information at trial and claimed that he would have done so if asked by Lloyd's attorney. The fact that Green did not voluntarily come forward before Lloyd's trial, and Lloyd's attorney never questioned Green, did not prevent the Supreme Court from finding that the exculpatory information possessed by Green was nonetheless new evidence when it was finally disclosed to Lloyd years later. Along the same lines, in this case, the record does not indicate that anyone asked Donaphin to verify Cleveland's whereabouts on August 7, 1991 at the time of trial. After the trial, Yant failed to follow up with Donaphin to obtain the relevant details. Therefore, Donaphin's affidavit, which contains additional information not previously possessed by Cleveland, is new evidence.

---

[4]We presume that both Lloyd and Cleveland were aware that they had been in the presence of Lieutenant Faherty and Donaphin, respectively, at the time of the crime and thus knew about the alibi information contained in Faherty's and Donaphin's affidavits before trial. However, both petitioners also alleged ineffective assistance of counsel in their habeas petitions. Specifically, Cleveland alleges that his trial counsel "was deficient for failing to adequately investigate [his] case and prepare for his trial." It is unclear why Cleveland's counsel did not obtain Donaphin's statement earlier. However, we agree with the Seventh Circuit that "[i]f procedurally defaulted ineffective assistance of counsel claims may be heard upon a showing of actual innocence, then it would defy reason to block review of actual innocence based on what could later amount to the counsel's constitutionally defective representation." *Gomez v. Jaimet*, 350 F.3d 673, 680 (7th Cir. 2003).

iv.     Flight Records

The last particularly relevant evidence submitted by Cleveland are flight records that show that the last flight from New York City to Cleveland on August 7, 1991 departed at 10:40 p.m. Given the information contained in Donaphin's affidavit about meeting with Cleveland for 15-20 minutes between 10:00 p.m. on August 7, 1991, and 12:00 a.m. on August 8, 1991, Cleveland contends it would have been impossible for him to be at the airport in time for that flight.

We recognize that this information was readily available during Cleveland's trial. Unlike much of the evidence discussed above, Cleveland's ability to obtain flight records was not contingent upon witnesses belatedly coming forward with exculpatory information. Nevertheless, without the Dehus and Donaphin affidavits narrowing the time-lapse between Cleveland's presence in New York and Blakely's murder, the flight records would not have been particularly relevant during trial. As discussed previously, Cleveland introduced alibi evidence during trial to demonstrate that he was in New York both on the morning of August 7, 1991 and on the morning of August 8, 1991. However, given the nearly twenty-four hour period for which he had no alibi evidence, introducing flight records at trial would only have damaged Cleveland's case as they would have shown that Cleveland had ample opportunity to fly from New York to Lorain, Ohio to commit Blakely's murder.

## 2.     Reliability

The next part of the *Schlup* test is to determine whether the new evidence submitted by Cleveland is reliable. The State does not attack the reliability of the flight records or the Dehus affidavit, and the district court did not find this evidence unreliable. Because we have no reason to question the reliability of this evidence, we conclude that this evidence is sufficiently reliable under *Schlup*.[5]

---

[5]We further note that the Dehus affidavit falls squarely within the ambit of "scientific evidence" and "critical physical evidence that was not presented at trial" that the *Schlup* Court stated petitioners could rely on to proceed through the actual innocence gateway. 513 U.S. at 324.

With regard to Avery's affidavit, the district court agreed with the magistrate judge that Avery's current recantation was not reliable based on perceived internal inconsistencies in the affidavit and inconsistencies between the affidavit and Avery's previous statements. The district court further noted that Avery's trial testimony, unlike his recantation, is supported by other evidence. Specifically, in one version of events, Avery explained that during Blakely's assault she hit Edwards, which caused him to start bleeding. The police ultimately obtained a jacket that Edwards wore on the night of the murder that had  spots of Edwards's blood, which is consistent with Avery's description.[6] *Id.* at 6. Avery also informed the police that a table leg in Epps's apartment was broken, which the police discovered was true days later when they photographed Epps's apartment. Detective Taliano also declared in an affidavit that he did not show Avery any crime scene photos during their first meeting, but Avery appeared to know information that only an individual present at the crime would know.

The internal inconsistencies in the affidavit referenced by the court below include Avery's claim that his father concocted the story that Cleveland and his co-defendants killed Blakely and also told him that those individuals were going to kill Avery next. However, Avery also claims that his father threatened to kill Avery if he refused to go along with the fabricated story. The affidavit also states both that Sr. fed Avery the story for the police and that Avery made up the story himself from the crime scene photographs. Further, the affidavit does not repeat the statement that Avery made in 2004 to Agent Beachum that his father killed Blakely.

Yet, Avery's 2006 affidavit is not as inconsistent as the magistrate and the district court concluded. In the fourth paragraph of the affidavit, Avery states:

> At the trials of Al Monday and those charged with him, I testified under oath that I was an eyewitness to Alfred Cleveland, who I knew as Monday, along with people I knew as JR, Will, and Shakeem beat

---

[6]Cleveland also points out that during the investigation, Avery constantly changed his story regarding whether Edwards started bleeding as a result of being struck by Blakely and whether Edwards continued to assault Blakely after being hit. *Compare* PageID #2654 (Avery did not notice any blood on Edwards) *with* PageID # 1583 ("She hit Will in the nose and he got to bleeding so he didn't put his hands on her no more.").

Marsha Blakely at Floyd Epps apartment in Lorain, Ohio and then murdered her behind Charlie's Bar in Lorain. All of this was a lie. I never witnessed the murder of Marsha Blakely, was not with her or Al Cleveland the night she was murdered. This was a story my father told me to tell.

In the eighth and ninth paragraphs of his affidavit, Avery expounds on his previous statement that his father instructed him to implicate Cleveland and the other three individuals:

> I first heard of the murder of Marsha Blakely while at my then girlfriend Patricia Gaddy' apartment in the Projects. A woman came to the house and said Marsha's body was found. I did not know who had done this, did not know anyone who was involved.
>
> I then went to Charlotte Watkin's house who was also a girlfriend of mine in the early in the morning. My Dad came over to Charlotte's house and told me Marsha was dead and they were going to kill me too. He said he would tell me how you can get out of all this. He told me that I could say I was a witness. He pulled out some crack and we smoked. *He then told me I had to memorize a story.* **This continued throughout the day and into the next. The story he told me to tell was that Al Monday came to get money, that Al said to go with him that we went in car together to Floyd Epps, that the rest were there (Will, JR, Shakeem). He said to say that Al wanted me to beat Marsha up and then did.**

Avery further explains:

> My Dad set up a meeting with the police. He as [sic] present during the interview. They showed me pictures of an apartment which they said was Floyd Epps' and asked me to describe what happened in the apartment. **I then made up the story of what happened in the apartment, based upon the pictures.**

Avery subsequently discusses the threats he received from his father:

> I made a couple of statements and a Deposition about what my Dad told me to say. Before the Deposition my Dad came to Charlotte Watkin's house. I told my Dad that this was wrong, that Al was my friend, that I had no reason to think he would hurt me. My Dad then said I had to go to the police and continue to tell this story or he would kill me, my son, and Charlotte, if I told anyone about his plan. I believed him. Someone

came and shot Charlotte's house up around this time. We called the
police and they came. I tried to show the police a bullet hole but they
just left and nothing came of it. I believed that my Dad was behind this
shooting as a warning which increased my fear of my Dad.

Thus, in his affidavit, Avery explains that his father provides him with a general
narrative to tell the police which includes the fact that Cleveland wanted him to assault
Blakely. Avery does not claim that his father fed him specific details about the assault
that took place inside Epps's apartment; rather, Avery claims that he fabricated the
details of the assault based on the crime scene photographs.[7] Although Avery's
declarations are contrary to Detective Taliano's declaration that he did not show Avery
any pictures at their initial meeting, they are not internally inconsistent.

Cleveland also convincingly claims that the circumstances surrounding Avery's
recantation render it more credible than his trial testimony or pre-trial statements. In
contrast to those statements that were made while Avery received money from the
police,[8] Cleveland's 2004 statement to the FBI was unsolicited and not given in
exchange for a monetary or other reward. We recognize that if Avery had recanted only
upon interrogation or pressure by Cleveland's family, his affidavit would be less
credible. However, in November 2004, Avery, then living in a new city and unable to
be located by Cleveland's family or private investigators, chose to voluntarily contact
a law enforcement official unrelated to the Blakely murder and recant his testimony.
Over one year later, upon hearing that Cleveland's family was trying to reach him,
Avery then contacted Cleveland's father and agreed to meet with Cleveland's attorney.
Avery went so far as to go to court prepared to recant his testimony. It was not until
Avery realized that he could receive thirty years in jail for perjury that he decided not
to give his testimony in court. In contrast to his 1991 recantation, Avery did not
withdraw his 2006 recantation when informed about the possibility of going to prison;
rather he invoked his Fifth Amendment right to remain silent.

[7]In his 2004 statement to the FBI, Avery does claim that Sr. provided him with some details about
Epps's apartment and the homicide, such as the position of a table in the apartment and scrapes on
Blakely's feet.

[8]Cleveland contends that Avery worked as a police informant through 1997.

In sum, the fact that Avery had no motive to recant his testimony but instead sought to do so on his own free will, and has not subsequently withdrawn that testimony, lends it credibility.    *See House*, 547 U.S. at 552 (stating that testimony of actual innocence from those with "no evident motive to lie . . . has more probative value than, for example, incriminating testimony from inmates, suspects, or friends or relations of the accused"); *Fairman v. Anderson*, 188 F.3d 635 (5th Cir. 1999) ("While Prewitt's status as a recanting witness detracts from the credibility of his new testimony . . . it is not a bar to the acceptance of such testimony.  Indeed, for the district judge in this case, Prewitt proffered a convincing reason for his recanting affidavit: the prosecution coerced him to lie at Fairman's trial by threatening to charge him with murdering Jones."). Further, the only discrepancy in the affidavit pertains to whether Detective Taliano showed Avery crime scene photographs during Avery's initial interview or at some later point in the investigation.  One discrepancy is not sufficient to render the entire affidavit unreliable.  Accordingly, we conclude that Avery's 2006 affidavit is reliable evidence.

As for Donaphin's affidavit, the magistrate judge determined that it was unreliable solely because  Donaphin initially gave his statement to the Northwestern University students in 2001, ten years after the events that occurred on August 7, 1991. The district court did not discuss the reliability or lack thereof of this affidavit.

We do not agree that the passage of time is sufficient in and of itself to render Donaphin's affidavit unreliable.  This is especially true given the fact that the date at issue is Donaphin's birthday, which makes it *more* likely that Donaphin would remember the events that  transpired on that date than if it had been another date with no particular significance.

Respondent argues that Donaphin has not provided an adequate reason for failing to come forward earlier.  However, Donaphin does state in his affidavit that Cleveland's representatives did not convey the importance of Donaphin's alibi statements, that he was unaware that Cleveland had been charged with committing murder rather than a drug offense, and that he was not aware that the crime for which Cleveland was charged was committed so soon after their meeting on the night of August 7, 1991.  Donaphin

further states that personal issues during that period kept him from coming forward earlier. It also bears mentioning that Donaphin does not have any apparent motive to lie on Cleveland's behalf. *See House*, 547 U.S. at 552. Although Donaphin has known Cleveland since childhood because they grew up in the same neighborhood, there is no evidence of any close ties between the two individuals. Therefore, Donaphin's affidavit does not have the same risk of bias as an affidavit made by close friends or relations of Cleveland. *Id.* Under the circumstances, we cannot agree with the lower court's conclusion that Donaphin's affidavit is unreliable.

### C.    Likelihood of Not Guilty Finding

Because Cleveland has submitted new and reliable evidence to support his claim of actual innocence, the next question is whether, based on the record as a whole, "it is more likely than not that no reasonable juror would have found [Cleveland] guilty beyond a reasonable doubt." *Schlup*, 513 U.S. at 327. In this case, the only evidence linking Cleveland to Blakely's murder was Avery's testimony. The only physical evidence presented at Cleveland's trial involved Cleveland's co-defendant Edwards and consisted of the existence of Edwards's own blood on his jacket, which the State argued was consistent with Avery's statement that Blakely hit Edwards during the first assault. During trial, Cleveland presented evidence that he was in New York between August 5 and August 8, 1991. The State asked cross-examination questions indicating that it was possible to drive between Lorain, Ohio, and New York, New York in six hours and fly between the two cities in under an hour-and-a-half. The new evidence that Cleveland presents – Dehus and Donaphin affidavits and flight records – provides strong support for Cleveland's claim that he was in New York at the time of Blakely's murder and undercuts the State's contention that Cleveland would have been able to travel from New York to Ohio in time to commit the murder.

In addition, during trial, the jury heard plenty of evidence that called Avery's credibility into question. The jury heard that Avery came forward with information about the murder only after the reward was offered, took the reward, refused to testify unless the prosecution gave him more reward money, and then, when the prosecution

refused to do so, Avery testified that he had lied about witnessing any acts involving Blakely and withdrew that recantation only after being placed in jail for perjury. The jury also heard that Avery thereafter testified at four trials about the involvement of Cleveland and his co-defendants in the murder. Had the jury also been able to consider Avery's unsolicited 2004 recantation, the 2006 recanting affidavit, evidence that Cleveland was in New York a couple of hours before Blakely's murder and could not have flown from New York to Ohio in time to commit the murder, along with the fact that there was no other evidence tying Cleveland to the crime, "it surely cannot be said that a juror, conscientiously following the judge's instructions requiring proof beyond a reasonable doubt, would vote to convict." *Schlup*, 513 U.S. at 331.

## IV.

For the foregoing reasons, we find that Cleveland has presented a credible claim of actual innocence that entitles him to equitable tolling of AEDPA's one-year limitations period and review of his habeas petition on the merits. We reverse and remand for further proceedings consistent with this opinion.[9]

---

[9]Because we conclude that Cleveland is entitled to equitable tolling, we need not decide whether he is also entitled to statutory tolling under 28 U.S.C. § 2244(d)(1).