NOT RECOMMENDED FOR PUBLICATION
File Name: 21a0514n.06

No. 21-3012

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

**FILED**
Nov 12, 2021
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| KEVIN MICHAEL THORNTON, | ) | |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO |
| | ) | |
| JAY FORSHEY, Warden, | ) | |
| | ) | |
| Respondent-Appellee. | ) | |
| | ) | |

BEFORE: ROGERS, GRIFFIN, and THAPAR, Circuit Judges.

GRIFFIN, Circuit Judge.

Brandishing a gun, a man robbed a metro-Cincinnati cash store in 2007. The store's employee not only identified petitioner Kevin Thornton as the robber but also confirmed that items recovered by police at his apartment were those worn by the man who pointed a gun at her. Other evidence indicated Thornton's involvement as well—he told his mother the police thought he was the robber, he told a friend he was the robber, and he changed his alibi in the face of contradictory facts.

After an Ohio jury convicted Thornton of aggravated robbery and kidnapping, Thornton obtained "new" evidence he contends demonstrates his actual innocence: the absence of his DNA on zip ties used during the robbery, and an expert's analysis of surveillance photos that showed, in the expert's opinion, the robber was shorter than Thornton. The district court concluded that he filed an untimely petition for a writ of habeas corpus, and that because he did not show "that it is

more likely than not that no reasonable juror would have convicted him in the light of the new evidence," Thornton could not utilize the so-called "actual innocence gateway" to excuse his petition's tardiness. *Schlup v. Delo*, 513 U.S. 298, 327 (1995). We agree and affirm.

I.

The facts as recited by the Ohio Court of Appeals are presumed correct on habeas review pursuant to 28 U.S.C. § 2254(e)(1), and are as follows:

> On September 11, 2007, at approximately 1:15 p.m., a man wearing sunglasses, a pair of thin cotton or wool gloves, and a hat entered the Cash Express on Main Street in the city of Milford, Clermont County, Ohio. The man walked up to the counter and asked store employee Leslie Fahey what he needed to do to obtain a loan. When Fahey walked around the counter to give him a brochure, the man pointed a handgun at her stomach and demanded money. When Fahey asked if he was serious, the man racked the slide on his handgun, thereby chambering a round in the weapon, and repeated his demand. Fahey handed over the contents of her cash drawer. The man then ordered Fahey to lie down on the floor, bound her hands and feet with zip ties, and told her not to scream or he would come back. After hearing nothing but silence, Fahey freed her hands, cut the zip tie on her feet and sent out an alarm using her computer.
>
> Even though the surveillance photographs of the robbery taken by the store's security camera did not show the robber's face, three Milford police officers believed that, given the perpetrator's height and posture, the robber was Thornton. When the police showed Fahey a photo lineup that did not include Thornton, but contained the photo of a known shoplifter, she did not identify any of the men in the lineup as being the robber. However, when the police showed Fahey a second photo lineup that contained Thornton's photograph, she identified Thornton as the man who robbed her.
>
> Thus, on the evening of September 11, 2007, police executed search warrants upon Thornton's apartment, the apartment of his girlfriend, and his mother's motor vehicle. When Sergeant Donald Mills of the Milford Police Department read Thornton the search warrant, Sergeant Mills did not mention that the warrant related to a robbery. However, Thornton explained to his mother, "They think I robbed the Cash Express. I think it's funny." Furthermore, Thornton initially stated that he was home with his mother "all day" but, when it was revealed that his mother had not been home all day, Thornton stated that he had slept all day. Thornton further explained that he knew about the Cash Express robbery because a neighbor told him he looked like the robber.

> From Thornton's apartment the police seized a black "Cincinnati Reds" t-shirt that was found lying on a table and appeared to have been recently worn. The police also seized a pair of sunglasses found lying underneath the "Cincinnati Reds" t-shirt. When later shown to Fahey, she identified the t-shirt and the pair of sunglasses as the items worn by the perpetrator during the robbery. However, the police did not find zip ties, a gun, money, or a black baseball cap in any of the locations searched.

*State v. Thornton*, 2013 WL 2636129, at \*1 (Ohio Ct. App. June 10, 2013) (alterations omitted). Moreover, "a friend of Thornton's testified that Thornton confessed to the crime." *Id.* at \*9. Based on these and other facts, an Ohio jury convicted Thornton of aggravated robbery and kidnapping with firearm specifications in 2008, and he was sentenced to (and did) serve twelve years in prison.[1] *Id.* at \*2.

In state collateral proceedings, Thornton presented two pieces of evidence not admitted at trial that he claimed entitled him to post-conviction relief. *Id.* at \*2–10. First, he obtained DNA testing on the zip ties used to bind the victim's hands and feet. *Id.* at \*2. The testing "revealed a single male DNA profile that did not match that of Thornton," and a subsequent review confirmed the testing "was performed correctly" and that there was no "possibility of accidental contamination" by "the law enforcement officers who worked the crime scene." *Id.* Second, Thornton had a photogrammetric expert—one who uses "triangulation [to] measure[] an object in a space where a photograph was taken"—analyze the surveillance photos of the robbery. *Id.* at \*3. That expert, Philip F. Locke, Jr., concluded that "the perpetrator in the surveillance photos . . . was approximately 5'11" tall with an accuracy rate of plus or minus three-fourths of an inch. Thus, the perpetrator could be no more than 6 feet tall. [Because] the parties stipulated at the 2008 trial that Thornton is 6'3" tall, Locke determined that it is clear to a reasonable degree of scientific

---

[1]Thornton remains on supervised release, which means he is still "in custody" for purposes of § 2254. *See Nian v. Warden, N. Cent. Corr. Inst.*, 994 F.3d 746, 751 (6th Cir. 2021).

certainty that the perpetrator could not possibly be Kevin Thornton." *Id.* (internal quotation marks omitted). The Ohio state courts denied him relief. *See id.* at *4–10.

Thornton then filed a petition for a writ of habeas corpus under 28 U.S.C. § 2254. It raised two grounds for relief: (1) his trial counsel was ineffective by failing to pursue DNA testing of the zip ties or photogrammetric analysis; and (2) he was actually innocent. Because he had previously filed another habeas petition, the district court transferred the petition to this court for authorization as a second or successive petition under § 2244, *see In re Sims*, 111 F.3d 45, 47 (6th Cir. 1997) (per curiam), which we subsequently granted, *In re Thornton*, No. 17-3282 (6th Cir. Nov. 17, 2017) (order). With proceedings reopened, the district court dismissed Thornton's petition as both untimely and unmeritorious. But it granted Thornton a certificate of appealability on two issues: "whether Petitioner's actual innocence claim excuses his failure to timely file the petition," and if so, "whether the petition states a valid claim of ineffective assistance of counsel."[2]

## II.

The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) provides a one-year statute of limitation for any "application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court." 28 U.S.C. § 2244(d)(1). The district court concluded that this one-year bar commenced at the latest on March 27, 2012 (the date of the DNA report), and that Thornton's July 8, 2014, petition was therefore untimely under § 2244(d)(1)(D). That holding is not before us. What is disputed is whether the district court correctly concluded that Thornton failed to muster evidence to excuse AEDPA's procedural bar by way of the actual-innocence

---

[2]It declined, however, to issue a certificate of appealability regarding its other holdings: (1) that the petition was untimely; (2) that equitable tolling did not apply to his untimely petition; and (3) that his standalone actual-innocence claim was not cognizable. Thornton did not move here to expand the certificate of appealability to address these issues.

gateway, a decision we review de novo. *See Davis v. Bradshaw*, 900 F.3d 315, 327 n.7 (6th Cir. 2018).

A.

The actual-innocence gateway is a procedure habeas petitioners must satisfy to have an "otherwise barred constitutional claim considered on the merits," *Schlup*, 513 U.S. at 315 (citation omitted), including one barred by the expiration of the statute of limitations, *McQuiggin v. Perkins*, 569 U.S. 383, 386 (2013). It "is grounded in the equitable discretion of habeas courts to see that federal constitutional errors do not result in the incarceration of innocent persons." *Id.* at 392 (internal quotation marks omitted). The gateway is not a mechanism that independently provides relief—that depends instead on the validity of the underlying constitutional claim, like, as here, a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668 (1984). *Schlup*, 513 U.S. at 315. To pass through the gateway, a petitioner must produce "new evidence" that establishes "a constitutional violation has *probably* resulted in the conviction of one who is actually innocent." *Id.* at 327 (citation omitted and emphasis added).

We first require that a state prisoner "support his allegations of constitutional error with new reliable evidence—whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence—that was not presented at trial." *Id.* at 324. Upon such a showing, a reviewing habeas court must then "consider all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial." *House v. Bell*, 547 U.S. 518, 538 (2006) (internal quotation marks omitted). In so considering, "the federal court [must] assess how reasonable jurors would react to the overall, newly supplemental record," which if the "new evidence so

requires, . . . may include consideration of the credibility of the witnesses presented at trial." *Id.* at 538–39 (internal quotation marks omitted).

"Based on this total record, the court must make a probabilistic determination about what reasonable, properly instructed jurors would do." *Id.* at 538 (internal quotation marks omitted). Only if the petitioner shows "that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence," *Schlup*, 513 U.S. at 327, may a court permit his underlying constitutional claim to pass through the gateway and review it on the merits. This probability standard is "less strict" than the familiar sufficiency-of-the-evidence standard set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979), and "does not require absolute certainty about the petitioner's guilt or innocence," *Cleveland v. Bradshaw*, 693 F.3d 626, 633 (6th Cir. 2012) (citation omitted). But it also "does not merely require a showing that a reasonable doubt exists in the light of the new evidence." *Schlup*, 513 U.S. at 329. The barrier to relief is significant: the petitioner must show that "no reasonable juror would have found the defendant guilty." *Id.* Both the Supreme Court and this circuit have emphasized this gateway is to be applied only in the "extraordinary case" because "a substantial claim that constitutional error has caused the conviction of an innocent person is extremely rare." *Id.* at 321, 324; *McQuiggin*, 569 U.S. at 386 ("We caution, however, that tenable actual-innocence gateway pleas are rare."); *Davis*, 900 F.3d at 326 ("But this innocence gateway is a narrow one.").

B.

We begin with the significant evidence of Thornton's guilt presented to the jury. Consider the testimony of Leslie Fahey, the store's teller. She expressly picked Thornton out of a photo lineup as the robber (and did so after being presented with a photo array that did not include

Thornton). *Thornton*, 2013 WL 2636129, at *1.[3] And she identified a pair of sunglasses and a black Cincinnati Reds t-shirt recovered from Thornton's apartment as "items worn by the perpetrator during the robbery." *Id.* Take too Thornton's own words. On the day of the robbery, he spontaneously offered to his mother that police suspected his involvement—commenting that "[t]hey think I robbed the Cash Express. I think it's funny."—before police mentioned the robbery. *Id.* He confessed to a friend that he was the robber. *Id.* at *9. And he changed his "I was with my mother" alibi once it was known he was not. *Id.* at *1. With this backdrop, we cannot agree with Thornton that "it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence."[4] *Schlup*, 513 U.S. at 327.

Although the DNA testing presents a version of the facts that would support Thornton's claim of innocence given the lack of his DNA on the zip ties, a reasonable juror could conclude that fact did not absolve Thornton. The robber wore gloves and the DNA "could just as easily have come from a factory-worker who manufactured the zip ties or a store clerk who stacked the zip ties on the shelf or sold the zip ties." *Thornton*, 2013 WL 2636129, at *9. The mere possibility that the robber's DNA could have nonetheless transferred to the zip ties during the commission of the crime is too speculative to reason otherwise.

The second piece of new evidence weighs more in Thornton's favor. Locke's photogrammetric analysis and resulting conclusion that the robber was no taller than six feet certainly helps the six-foot three-inch Thornton; indeed, it bolsters the argument Thornton's

---

[3]Three police officers also identified Thornton after reviewing the store's surveillance photographs. *Id.*

[4]The warden does not dispute, and we assume for the sake of this appeal, that the offered DNA evidence and expert-witness report qualifies as new reliable evidence under *Schlup*. 513 U.S. at 324.

counsel made at trial during closing argument when reviewing the same surveillance photos and Fahey's testimony. *See id.* at *5. But however supportive, a reasonable juror could reject Locke's analysis of the grainy surveillance photos considering Fahey's identification of both Thornton and the effects gathered from his apartment and Thornton's inculpating statements—evidence that was in no way impacted by Locke's analysis.

Nor do we find occasion to reevaluate whether Fahey credibly identified Thornton in the first instance or the circumstances of Thornton's confession, as Thornton insists we should. In his habeas petition, Thornton did not take issue with the state court's factual determinations—that Fahey accurately identified Thornton and that it was a "friend" who identified Thornton—under § 2254(d)(2)'s unreasonable-determination-of-the-facts prong. Yes, the Supreme Court has stated that "[i]f new evidence so requires," evaluating a petitioner's actual-innocence gateway claim "may include consideration of 'the credibility of the witnesses presented at trial.'" *House*, 547 U.S. at 538–39 (quoting *Schlup*, 513 U.S. at 330). But that is not a requirement and certainly does not merit any application here, for neither the DNA nor the photogrammetric evidence have any bearing on those witnesses' ability or motive to identify Thornton.

Because it is probable that a reasonable juror would still have convicted Thornton despite the new evidence, Thornton did not establish that this is the "extraordinary case" meriting passing through the actual-innocence gateway. *Schlup*, 513 U.S. at 321. The district court therefore correctly dismissed his petition as procedurally barred.

III.

For these reasons, we affirm the judgment of the district court.