RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 18a0172p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

─────────────

IAN R. DAVIS,

　　　　　　　　　*Petitioner-Appellant*,

　　　*v.*

MARGARET BRADSHAW, Warden,

　　　　　　　　　*Respondent-Appellee*.

No. 17-3262

─────────────

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 1:14-cv-02854—Patricia A. Gaughan, District Judge.

Argued:  June 12, 2018

Decided and Filed:  August 16, 2018

Before:  GIBBONS, STRANCH, and BUSH, Circuit Judges.

─────────────

## COUNSEL

**ARGUED:**  Joanna Sanchez, OFFICE OF THE OHIO PUBLIC DEFENDER, Columbus, Ohio, for Appellant.  Stephanie L. Watson, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.  **ON BRIEF:**  Joanna Sanchez, OFFICE OF THE OHIO PUBLIC DEFENDER, Columbus, Ohio, for Appellant.  Stephanie L. Watson, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

─────────────

## OPINION

─────────────

　　JOHN K. BUSH, Circuit Judge.  A recantation is not always a good reason for a new trial.  The recanting witness, in fact, may have told the truth the first time.  Other evidence may corroborate the earlier testimony over the recantation.  Such is the case here.

Ian Davis is currently incarcerated for the assault and murder of Marsha Blakely. His conviction was based on the testimony of an eye-witness, William Avery, Jr., who changed his story several times before Davis's trial. But corroborating evidence permitted the jury to credit Avery's trial testimony that implicated Davis.

Years later, Avery recanted his trial testimony, claiming that he did not witness Blakely's murder and that he admitted this to the prosecutor before testifying against Davis. Based on Avery's recantation, Davis filed a successive petition for a writ of habeas corpus under 28 U.S.C. § 2254. His petition stems from the prosecution's alleged knowing presentation of Avery's perjured testimony at trial.

The district court denied Davis's petition because of several procedural infirmities, including that his petition was filed outside the one-year statute of limitations. Because Davis's petition was untimely and because he cannot show a credible claim of actual innocence to overcome the statute of limitations, we AFFIRM.

I.

On August 8, 1991, the slain body of Marsha Blakely was found in an alley behind the Westgate Plaza in Lorain, Ohio. *State v. Davis*, No. 94CA005989, 1996 WL 121998, at *1 (Ohio Ct. App. Mar. 20, 1996). She had been cut and bruised, her throat had been slashed, and she had been run over by a car. *Id.* Blakely's friend, Floyd Epps, was killed around the same time, and his body was found less than a quarter mile from Blakely's. The Lorain Police Department believed the deaths were connected. The police investigation stalled until a reward was offered. *Id.* At that time, Avery came forward and made a statement to police that implicated Davis, and three others, in the death of Blakely. *Id.* Davis and his codefendants were then indicted for Blakely's assault and murder.

Before Davis's trial, Avery provided several statements to the police, testified in a deposition, and recanted his story during the trial of one of Davis's codefendants. Below is a timeline of Avery's statements.[1]

> *September 11, 1991 Recorded Statement. . . .* [On September 10, 1991,] Avery's father, Avery Senior ("Senior"), went to the Lorain police and told them he had a witness to Blakely's murder. The next day, Senior brought his son to the police station where Avery told officers he would provide information he had in exchange for the $2,000 advertised reward and protection from the murderers. Avery proceeded to give officers a summary of what he professed to know about the crime.
>
> Avery told detectives he owed about $3,000 to a New York drug trafficker he knew as "Al Monday" ([Alfred] Cleveland's pseudonym) and that he was to satisfy this debt by assaulting an individual who also owed Cleveland money. Avery told detectives that Cleveland approached him on August 7 about assaulting someone and Cleveland took him to Floyd Epps'[s] apartment, where a second car with three males associated with New York drug trafficking also arrived (later identified as Benson Davis [aka Ian Davis, petitioner in this case], Lenworth Edwards, and John Edwards). Avery claimed that he, Cleveland, and the men from the second car entered Epps'[s] apartment where they encountered Blakely with another male New York drug trafficker.
>
> Avery told detectives that at this point Cleveland told him to assault Blakely in order to get information from her about missing drugs and money. Avery was unwilling to do so because he had grown up with Blakely. After he refused to assault Blakely, Cleveland directed the other men to assault her, which they did. Avery relayed that Blakely struck Lenworth Edwards in the face during the assault, causing Edwards to cover his face and retreat from the attack.
>
> ***
>
> During this interview, Avery told detectives that Blakely was rendered unconscious during the attack, at which time [Ian] Davis dragged her out of the apartment and placed her in the backseat of the car Davis, Lenworth Edwards, and John Edwards had arrived in. Avery got back into the car with Cleveland, and Cleveland proceeded to return Avery to his home. Avery did not know what happened to Blakely after she was put in the other car with the three men. He told detectives he did not witness her murder.

---

[1]This timeline comes from the district court's opinion in the habeas case of one of Davis's codefendants and is not contested by Davis in this appeal.

*September 20, 1991 Interview*. . . . In an effort to confirm the information Avery provided to police on September 11, police gave Avery a polygraph exam. The exam indicated Avery had additional information about the murder and had not been completely forthcoming. After police advised Avery of the polygraph results, he gave a new recorded statement to police, adding details to his initial statement.

Avery now told police that Cleveland left after dropping Avery off at his home but later returned on foot to Avery's home after about one or two hours. Upon his return, Avery reported that Cleveland stated "We took care of that junkie . . . . We knocked her off." (alteration in original). Avery was afraid to relay this detail during the initial interview because he was fearful of retaliation from the perpetrators.

\*\*\*

*September 26, 1991 Deposition*. The prosecutor deposed Avery with defendant Lenworth Edwards and his defense counsel present . . . . At that time, Edwards had been charged and arrested for the assault and murder of Blakely. The deposition was taken to preserve Avery's testimony because the prosecution feared that something could happen to Avery prior to trial. Avery testified to the same facts he reported to police on September 11 and 20.

Following Avery's deposition testimony, the Lorain County Prosecutor's Office provided him with $1,000 for relocation expenses and $2,000 in reward money. Avery relocated to Detroit but returned to Lorain after a short time.

*December 1991 Contempt of Court and Recantation*. After Lenworth Edwards'[s] trial commenced, Avery told Detective Taliano that he would not testify at the trial unless he was given "immunity" and another $10,000. The trial court brought Avery to the witness stand outside the presence of the jury at which time Avery asserted his Fifth Amendment right and refused to testify. The prosecutor and the court informed Avery he was not under the threat of indictment for any crime, so he could not assert the Fifth Amendment as a basis not to testify. Avery continued to refuse to testify unless he was paid additional money. The judge jailed Avery for contempt of court.

A couple days later, as Avery sat in the Lorain County Jail for contempt of court (the same jail where Lenworth Edwards was being held), Avery contacted a [Federal Bureau of Investigation ("FBI")] agent and told the agent Edwards had threatened him and his family—Edwards made a motion with his finger across his own neck to simulate a throat being sliced; Edwards later formed his hand in the shape of a handgun and pointed at Avery; a corrections officer approached Avery and told him to "save himself" and not testify against Edwards, admonishing Avery that the perpetrators of Blakely's murder knew where Avery's father and girlfriend lived. After these threats, Avery returned to the trial court and recanted, testifying that he had previously lied to police and in his pretrial deposition about

the events of August 7–8. He told the trial court he lied in order to obtain the reward and relocation money. The judge declared a mistrial.

*January 1992 Interview.* Avery, incarcerated for perjury in connection with the Lenworth Edwards case, told officers he had additional information about Blakely's murder, beyond what he had already provided. Detective Resendez conducted an interview with Avery.

\*\*\*

Avery's story changed from his prior version. He now claimed that he was not taken home by Cleveland after Blakely was dragged from the apartment. Instead, they all drove directly to the Westgate Plaza (the commercial plaza near the alley where Blakely's body was discovered). Upon arriving, Avery told police that he and Cleveland drove behind the plaza where the still-unconscious Blakely was taken out of the second car and placed on the ground. Avery now relayed that a new unknown black male (known only as "Justice"), who was already behind the shopping plaza in another vehicle, walked over to Blakely's body and began making downward thrusting motions at her body with a shiny object that Avery could not identify. Avery stated that at this point he got scared and ran home and spent the remainder of the night with his girlfriend, Patricia Gaddy. The next morning Gaddy informed him that Blakely's body had been found behind the Westgate Plaza.

After hearing this, Avery left his house and went to the home of his other girlfriend, Charlotte Watkins. After three or four days, Avery told Watkins about witnessing Blakely's assault and murder. Avery and Watkins then went to his father's house and told Senior what happened.

In this interview with Detective Resendez, Avery admitted he had lied when he previously testified Cleveland had made a statement to him about how he "knocked that junkie off," and did so because he did not want to place himself at the scene of the murder, so he made up the story about seeing Cleveland again.

*Cleveland v. Bradshaw*, 65 F. Supp. 3d 499, 515–18 (N.D. Ohio 2014) (internal record citations omitted).

During Edwards's retrial, Avery testified consistently with his January 1992 interview. He explained that his original statements implicating Edwards were true, that he had lied when he recanted during Edwards's first trial, and that he had seen part of the second assault that eventually caused Blakely's death before he ran away. Avery later testified similarly in Davis's, Cleveland's and John Edwards's trials.

Davis's case proceeded to trial on September 19, 1994. A jury found Davis guilty of felonious assault and aggravated murder. He was given consecutive prison sentences: eight to fifteen years on the felonious-assault charge and life in prison with parole eligibility after twenty years on the aggravated-murder charge. Davis timely appealed, and the Ohio Ninth District Court of Appeals affirmed. *Davis*, 1996 WL 121998, at *1–4. The Ohio Supreme Court declined jurisdiction. *State v. Davis*, 667 N.E.2d 985 (Ohio 1996) (table).

In 1998, Davis filed his first habeas petition, which the district court denied as time barred. Then, he moved for a new trial in state court based on newly discovered evidence—an allegation that two unidentified Hispanic men were responsible for Blakely's death. The trial court denied the motion as untimely, the Ohio Court of Appeals affirmed, and the Ohio Supreme Court declined jurisdiction. *State v. Davis*, No. 98CA007062, 1999 WL 194473, at *1–2 (Ohio Ct. App. Mar. 31, 1999); *State v. Davis*, 711 N.E.2d 1010 (Ohio 1999) (table).

Years later, in February 2004, Avery went to the FBI and told them that he had lied when he testified that he witnessed Blakely's murder, that his father had committed the murder, and that his father had pressured him to come forward so that he could collect the reward money and hide his own guilt. Avery said he testified because he feared that Cleveland would try to kill him over a $5,000 drug debt. He never stated that law enforcement had shown him photographs or pressured him for his testimony. After meeting with Avery, FBI Agent William Beachum investigated Avery's claims. In 2005, he spoke with Avery Sr., who said that he was with a clergy member when the murder occurred, and that Avery told him about Blakely's murder. Avery Sr. offered to take a polygraph.

In 2006, the lawyers and investigators working on the case of one of Davis's codefendants obtained an affidavit from Avery in which he recanted his testimony at the trials of Davis, Cleveland, Lenworth Edwards, and John Edwards. Avery stated: "I never witnessed the murder of Marsha Blakely, was not with her or Al Cleveland the night she was murdered. This was a story my father told me to tell." Doc. 1-2, Avery Affidavit, Page ID# 104. He did not repeat the claim he made to the FBI that his father killed Blakely. Instead, he declared his father told him Blakely was killed and convinced him that he (Avery) was in danger of being killed too but that he could escape this risk by claiming to have witnessed Blakely's murder. *Id.* at Page

ID# 105.  Avery stated that his father had him memorize the story that he told the police.  *Id.*  He explained that his dad set up the police interview, that the police showed him pictures of Epps's apartment and asked him to describe what happened, and that he then made up the story based on the pictures.[2]  *Id.* at Page ID# 106.

Avery also added something not mentioned in his recantation to the FBI.  He stated that before Edwards's retrial, he admitted to prosecutor Jonathan Rosenbaum that he did not witness Blakely's murder, but Rosenbaum pressured him to provide false testimony:

> At some point I was put in jail for protective custody.  I then testified at the first trial of Lenny Edwards.  My father wanted all the reward money.  He wanted me to ask for $10,000.
>
> I told [p]rosecutor Rosenbaum that I was lying for the money.  We were alone in a room at the courthouse.  He got very upset at me and scared me.  He told me if these dudes don't go down for this, that I would.  When I then asked him for the $10,000, he got more upset.[3]

*Id.* at Page ID# 106–07.

Davis claims he was unaware of Avery's 2006 affidavit until November 2011, when Cleveland gave him a copy.  Seven months later, in June 2012, he moved for leave to file a motion for new trial in state court.[4]  The state trial court denied Davis's motion.  The court of appeals affirmed, holding that Davis did not provide clear and convincing proof that he was unavoidably prevented from discovering his new evidence promptly and that he failed to show

---

[2]In the affidavit, Avery also mentioned his prior recantation to the FBI.  He says he recanted "in the Summer, 2005," and the FBI said they "would check it out and get back to [him]"; however, he "never heard from them again."  Doc. 1-2, Avery Affidavit, Page ID# 107.  In Agent Beachum's affidavit, he stated that he met with Avery only once, in November 2004.  Beachum also stated at no time during the interview did Avery allege that police had shown him photos of the crime scene that he used to conjure up a story.

[3]Two months after Avery signed his recantation affidavit, Cleveland's investigators obtained from him a sworn, recorded statement in which Avery again claimed he did not witness Blakely's murder.

[4]Based on Avery's affidavit, Cleveland also sought state postconviction relief.  In 2010, he filed an untimely habeas petition, which this court resurrected after holding that he had a credible claim of actual innocence.  *Cleveland v. Bradshaw*, 693 F.3d 626, 635–42 (6th Cir. 2012).  On remand, however, the district court held an evidentiary hearing (the "*Cleveland* Evidentiary Hearing"), found Avery's trial testimony reliable and supported by corroborating physical evidence, and determined that "Cleveland's claim of innocence for his involvement in Blakely's murder [was] not borne out by the evidence."  *Cleveland*, 65 F. Supp. 3d at 542.  This court denied a certificate of appealability because Cleveland had "not demonstrated that the prosecution knew or even should have known that Avery was lying."  *Cleveland v. Bradshaw*, No. 15-3029 (6th Cir. Feb. 24, 2016) (order).

that he filed his motion within a reasonable time after obtaining the new evidence. *State v. Davis*, No. 12CA0102561, 2013 WL 936241, at *1–4 (Ohio Ct. App. Mar. 11, 2013); *State v. Davis*, 989 N.E.2d 1019 (Ohio 2013) (table) (declining to review).

In August 2013, Davis filed an application in this court to file a successive habeas petition. We granted Davis's application for his claims stemming from Avery's alleged perjury, holding:

> If it were proven that Avery fabricated his testimony, that he was pressured by the prosecution to testify falsely at trial, and that the prosecution withheld evidence casting further doubt on Avery's credibility, Davis could establish that a constitutional violation occurred and that, absent this violation, no reasonable factfinder would have found him guilty.

*In re: Ian R. Davis, aka Benson Davis*, No. 13-3981 (6th Cir. May 5, 2014) (order). We then transferred the case to the district court, where Davis filed this petition. His first ground for relief, and the only one now at issue, is that the prosecution violated his due process rights by presenting testimony at his trial that it knew or should have known was false.

Over a year after Davis filed his petition, and six months after the parties had completed briefing, Davis moved for leave to conduct discovery. As relevant here, he sought: (i) depositions of Avery, prosecutor Rosenbaum, and police detectives Geno Taliano and Richard Resendez; (ii) the complete file from his and his codefendants' prosecutions; (iii) a complete copy of the Marsha Blakely and Floyd Epps files in possession of the Lorain Police Department; and (iv) a complete copy of all files related to Avery in possession of the Lorain County Sheriff's Office and Lorain County Correctional Facility. The warden opposed and moved to expand the record to include the record from the habeas case of Davis's codefendant, Cleveland. Davis did not oppose the Government's motion to expand the record. In fact, he had earlier made the same request, and his petition relied on evidence from the *Cleveland* Evidentiary Hearing. Davis argued, however, that expansion of the record would be an inadequate substitute for his own discovery. The magistrate judge denied Davis's motion and granted the warden's, expanding the record to include the evidentiary hearing transcript and exhibits from the *Cleveland* Evidentiary Hearing. Over Davis's objection, the district court declined to modify or set aside the magistrate judge's order.

The magistrate judge then issued a Report and Recommendation recommending that the district court deny Davis's petition. The magistrate judge found that Davis failed to satisfy the gatekeeping requirements for successive habeas petitions, *see* § 2244(b)(2)(B)(ii); that his petition was filed outside the statute of limitations, *see* § 2244(d)(1); and that his claims were procedurally defaulted. The district court adopted the Report and Recommendation, denied the petition, and granted a certificate of appealability. *Davis v. Bradshaw*, No. 1:14 CV 2854, 2017 WL 626138, at *1–12 (N.D. Ohio Feb. 15, 2017). Davis timely appealed. He also sought to expand his appeal to include the denial of his motion for leave to conduct discovery.[5] We expanded his appeal.

## II.

Davis disputes each reason the district court provided for dismissing his petition. Because we agree with the district court that Davis's petition was untimely filed and because Davis has not shown entitlement to an exception from this time limit, we affirm the dismissal of his petition based on its having been filed outside the statute of limitations.

When a district court dismisses a habeas petition as untimely, we review de novo. *Vroman v. Brigano*, 346 F.3d 598, 601 (6th Cir. 2003). Davis filed his petition after the effective date of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), so it is subject to AEDPA's stringent standards. *Smith v. Mitchell*, 567 F.3d 246, 255 (6th Cir. 2009). AEDPA imposes a one-year statute of limitations for habeas petitions brought by individuals challenging their state-court convictions. *See* 28 U.S.C. § 2244(d)(1); *McCray v. Vasbinder*, 499 F.3d 568, 571 (6th Cir. 2007).

---

[5]Davis did not seek to appeal the district court's expansion of the record to include the record from the *Cleveland* Evidentiary Hearing.

28 U.S.C. § 2244(d) provides, in relevant part:

(1) A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court. The limitation period shall run from the latest of—

. . .

(D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

The statute tolls this one-year deadline while "a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending." 28 U.S.C. § 2244(d)(2).

The parties agree that the one-year limitations period for Davis to file his habeas petition began to run in November 2011—when Cleveland gave Davis a copy of Avery's 2006 affidavit. Yet Davis did not file in federal court until August 2013, more than one year later. So AEDPA's statute of limitations bars Davis's petition from being considered unless the time limit was suspended under the statute's tolling provisions or an equitable exception applies.

Davis argues that because he moved in state court within one year of having discovered the basis for his claim, the time during which his state-court litigation was pending should not be counted against him. *See* § 2244(d)(2). But Davis's petition does not qualify for tolling because his state-court motion was not properly filed.

Only "properly filed" state court motions toll AEDPA's statute of limitations. 28 U.S.C. § 2244(d)(2); *Artuz v. Bennett*, 531 U.S. 4, 8 (2000). "[A]n application is '*properly* filed' when its delivery and acceptance are in compliance with the applicable laws and rules governing filings"—including any state-imposed time limits. *Artuz*, 531 U.S. at 8; *Pace v. DiGuglielmo*, 544 U.S. 408, 413 (2005). A state postconviction motion that a court cannot consider because the petitioner failed to include a timely claim is not "properly filed," for purposes of AEDPA's statutory tolling provision. *Pace*, 544 U.S. at 413–17 ("In common understanding, a petition filed after a time limit, and which does not fit within any exceptions to that limit, is no more 'properly filed' than a petition filed after a time limit that permits no exception."); *see Vroman*, 346 F.3d at 603 ("[F]ederal courts . . . defer to a state court's judgment on issues of state law

and, more particularly, on issues of state procedural law." (alteration in original) (citations omitted)).

The Ohio courts decided that Davis's state-court motion for a new trial was untimely. Davis filed his state court new-trial motion seven months after Cleveland provided him with a copy of Avery's affidavit. Under Ohio Rule of Criminal Procedure 33(B), Ohio courts will entertain a new-trial motion like the one Davis tried to file if the defendant establishes "by clear and convincing proof that [he] was unavoidably prevented from the discovery of the evidence." The Ohio trial court denied Davis's motion, and the Ohio appellate court affirmed, holding that Davis's motion was not timely filed under Rule 33(B). *Davis*, 2013 WL 936241, at *2–3. The Ohio Court of Appeals explained that Davis's motion did not satisfy the Rule 33(B) standard:

> Mr. Davis does not provide clear and convincing proof as to why he was unavoidably prevented from discovering this evidence in a timely manner. Further, Mr. Davis waited an additional seven months after discovering this evidence to file his motion for leave. Again, Mr. Davis provides no explanation regarding the reasonableness of his actions in waiting seven additional months to file his motion.

*Id.* at *3. The Ohio Supreme Court declined to exercise its discretionary jurisdiction. *State v. Davis*, 989 N.E.2d 1019 (Ohio 2013) (table). Thus, the Ohio courts determined that Davis's motion was "not properly before" the court because it did not meet Ohio's rules governing new-trial motions. *Davis*, 2013 WL 936241 at *3. As a result, Davis's petition does not receive the benefit of statutory tolling. *See, e.g.*, *Anderson v. Warden*, No. 5:09 CV 0671, 2010 WL 1387504, at *3 (N.D. Ohio Mar. 9, 2010) (holding that Ohio court's determination—that petitioner's motions for leave to move for a new trial were untimely under Ohio Crim. R. 33(B)—rendered motions not "properly filed" under 28 U.S.C. § 2244(d)(2)); *Smith v. Smith*, No. 1:09 CV 132, 2010 WL 1416994, at * 2 (N.D. Ohio April 6, 2010) (same).

That Davis did not know his state-court motion was not properly filed until the Ohio courts ruled on it does not affect the analysis. The Supreme Court outlined a clear solution to this "predicament" in *Pace*. 544 U.S. at 416–17. As the Court explained, "[a] prisoner seeking state postconviction relief" may "fil[e] a 'protective' petition in federal court and ask[] the federal court to stay and abey the federal habeas proceedings until state remedies are exhausted."

*Id.* at 416 (citing *Rhines v. Weber*, 544 U.S. 269, 278 (2005)). "A petitioner's reasonable confusion about whether a state filing would be timely will ordinarily constitute 'good cause' for him to file in federal court." *Id.* But here Davis filed no protective petition and thus left everything riding on the adequacy of his state-court motion.

Davis asks us to disregard the Ohio courts' ruling on his new-trial motion. He cites our rule that "when a state erroneously relies upon its own rule of procedural default, the [habeas] claim is not barred." *Post v. Bradshaw*, 621 F.3d 406, 423 (6th Cir. 2010). And he contends that the Ohio courts misapplied Rule 33(B) by erroneously faulting him for not discovering the basis for his claim earlier. To support this argument, Davis cites this court's order authorizing the district court to consider his habeas petition. Indeed, at an earlier stage of this case, a panel of this court decided that Davis had made a prima facie showing that he could not have previously discovered, through the exercise of due diligence, the new evidence on which his petition now relies. *In re: Ian R. Davis, aka Benson Davis*, No. 13-3981 (6th Cir. May 5, 2014) (order).

But Davis's reliance on our prior ruling in this case is misplaced. As both the magistrate judge and district court properly determined, this court's decision allowing Davis to file a successive habeas petition does not determine whether the Ohio courts erred in finding his state-court motion untimely. When we authorize a petitioner to file a successive habeas petition under 28 U.S.C. § 2244(b)(3), we do not consider whether that claim was timely filed, or whether it has been procedurally defaulted under state law. *See In re McDonald*, 514 F.3d 539, 543–44 (6th Cir. 2008). So our prior decision in this case did not resolve whether Davis's state-court motion satisfied Ohio Crim. R. 33(B). Our court decided only that Davis diligently discovered the facts underlying his claim for purposes of 28 U.S.C. § 2244(b). And importantly, this court made that decision under a much lower standard of proof—prima facie evidence, not clear and convincing proof. *Compare* 28 U.S.C. § 2244(b)(3)(C) *with* Ohio Crim. R. 33(B). Davis cites no authority for his argument that this court's ruling in the § 2244 gatekeeping context allows us to disregard a state court's finding of untimeliness under the state's own procedural rule. *See Vroman*, 346 F.3d at 604 ("Federal courts are obligated to accept as valid a state court's interpretation of state law and rules of practice of that state.").

Importantly too, when the Ohio courts decided that Davis's new trial motion failed under Ohio Crim. R. 33(B), they relied not only on his having failed to act diligently in discovering the facts underlying his claim but also on his having waited seven months *after* he discovered the Avery affidavit before filing his state-court motion. *Davis*, 2013 WL 936241, at \*3 ("If there has been an undue delay in filing the motion after the evidence was discovered, the trial court must determine if that delay was reasonable under the circumstances or that the defendant has adequately explained the reason for the delay." (citation and internal quotations omitted)). When our court allowed Davis to file a successive habeas petition, we examined only his diligence in discovering the factual predicate for his claim, *see* 28 U.S.C. § 2244(b)(2)(B)(i), not his having diligently pursued his rights after discovering those facts. *See In re: Ian R. Davis, aka Benson Davis*, No. 13-3981 (6th Cir. May 5, 2014) (order). So again, our prior decision does not provide a basis for rejecting the Ohio court's determination that Davis's state-court filing was late.

Because Davis is ineligible for AEDPA's statutory tolling, his claim is time barred. Generally, this would prevent a district court from considering the merits of his claim. But Davis argues that we should exempt him from AEDPA's statute of limitations because he has a credible claim of actual innocence.[6]

A habeas petitioner is entitled to an equitable exception to AEDPA's one-year statute of limitations if he makes a credible showing of actual innocence. *See McQuiggin v. Perkins*, 569 U.S. 383, 392 (2013); *Souter v. Jones*, 395 F.3d 577, 599 (6th Cir. 2005). This type of actual-innocence claim, sometimes called gateway innocence, "does not by itself provide a basis for relief." *Schlup v. Delo*, 513 U.S. 298, 315 (1995). The innocence showing is "not itself a constitutional claim, but instead a gateway through which a habeas petitioner must pass to have his otherwise barred constitutional claim considered on the merits." *Id.* (quoting *Herrera v.*

---

[6]Davis asks us to apply "equitable tolling" to save his claim, but his argument is best construed as a request for this court to apply the actual-innocence exception to AEDPA's time bar. Indeed, Davis refers to his innocence as the reason for tolling the statute of limitations, and the cases he cites analyze the actual-innocence exception to AEDPA's statute of limitations, not the equitable tolling doctrine. At times, this court has conflated the two. *See, e.g.*, *McDonald v. Warden, Lebanon Corr. Inst.*, 482 F. App'x 22, 31 n.5 (6th Cir. 2012) (explaining that the Sixth Circuit has "described a claim of actual innocence as a species of 'equitable tolling'"). But the distinction between the two doctrines matters: equitable tolling requires a showing of diligence, while the actual-innocence exception does not. *See McQuiggin v. Perkins*, 569 U.S. 383, 399–401 (2013). In actual-innocence-exception cases, courts consider diligence only when determining the credibility of evidence proffered to show actual innocence. *Id.* at 401.

*Collins*, 506 U.S. 390, 404 (1993)).   Thus, a petitioner's showing of a credible claim of innocence allows him to skirt a procedural defect in his claim so that a federal court may address his allegation of constitutional error.

But this innocence gateway is a narrow one.   The Supreme Court has cautioned that it "should open only when a petition presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error."   *McQuiggin*, 569 U.S. at 401 (citation and internal quotation marks omitted).   The exception "applies to a severely confined category:  cases in which new evidence shows it is more likely than not that no reasonable juror would have convicted [the petitioner]."   *Id.* at 395 (alteration in original) (citation and internal quotation marks omitted); *see Souter*, 395 F.3d at 590.   The reviewing court must make a "probabilistic determination about what reasonable, properly instructed jurors would do."   *House v. Bell*, 547 U.S. 518, 538 (2006) (citation omitted).

Because a gateway-innocence claim "involves evidence the trial jury did not have before it, the inquiry requires the federal court to assess how reasonable jurors would react to the overall, newly supplemented record."   *Id.*   In doing so, we "must consider all the evidence, old and new, incriminating and exculpatory, without regard to whether it would necessarily be admitted under rules of admissibility that would govern at trial."   *Id.* (citations and internal quotation marks omitted).   We also "consider how the timing of the submission and the likely credibility of the affiants bear on the probable reliability of [new] evidence."   *Id.* at 537 (citations and internal quotation marks omitted).

For a petitioner to establish entitlement to the actual-innocence exception, he must support his allegations of constitutional error with new, reliable evidence, such as exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence, that was not presented at trial.   *Id.*   For example, in the one Supreme Court case in which the petitioner satisfied the gateway-innocence standard, the Court held that "the central forensic proof connecting [the petitioner] to the crime—the blood and the semen—ha[d] been called into question and [he] ha[d] put forward substantial evidence pointing to a different suspect."   *Id.* at 554.   Although it was "not a case of conclusive exoneration," and some evidence still

"support[ed] an inference of guilt," the Court held that it was "more likely than not that no reasonable juror viewing the record as a whole would lack reasonable doubt." *Id.* Similarly, in *Souter*, this court held that the petitioner established gateway innocence where he presented compelling scientific evidence that the "only evidence which directly tie[d]" him to the victim's death, could not have caused the victim's injuries. *Souter*, 395 F.3d at 590.

In contrast, we have refused to open the innocence gateway when the petitioner's proffered evidence was less reliable. For example, in *Whalen v. Randle*, we held that the petitioner was "unable to demonstrate that he was actually innocent" even though his evidence included testimony by his alleged codefendant that the petitioner was not an accomplice in the robberies because of "the doubtful credibility of petitioner's accomplice." 37 F. App'x 113, 116, 121 (6th Cir. 2002). Similarly, in *Knickerbocker v. Wolfenbarger*, where the petitioner presented an inmate's affidavit stating that the petitioner's codefendant had told the affiant that the petitioner did not strangle the murder victim, we held that this was insufficient to demonstrate the petitioner's actual innocence, in part, because the statements were hearsay, and "thus presumptively less reliable than direct testimony." 212 F. App'x 426, 433 (6th Cir. 2007).

With this background in mind, we turn to the evidence at issue in this case.[7]

We begin with the evidence produced at Davis's trial. The state appellate court that affirmed Davis's conviction noted that Avery provided the following testimony at trial:

> Davis and some of his associates from New York sold drugs in the Lorain housing projects. Avery often purchased crack cocaine from these drug dealers. On one occasion Avery was fronted some crack by Al Monday, the leader of the New York group. Avery was to sell the crack and then pay Monday. Avery, however, got behind in paying Monday back. Avery then offered to "beat somebody up" to pay off his $3,000 to $4,000 drug debt to Monday.
>
> On August 7, 1991, Monday attempted to take advantage of Avery's services. Avery accompanied Monday to the apartment of Floyd Epps, where Blakely was

---

[7]The Supreme Court's guidance on the appropriate standard of review for a gateway-innocence claim is unclear. In *House*, the Court seemed to apply de novo review. *See House v. Bell*, 547 U.S. 518, 539–53 (2006). But in *McQuiggin*, the Court implied that on remand abuse-of-discretion review should apply. *See McQuiggin*, 569 U.S. at 401 ("On remand, the District Court's appraisal of Perkins' petition as insufficient to meet *Schlup*'s actual-innocence standard should be dispositive, absent cause, which we do not currently see, for the Sixth Circuit to upset that evaluation."). In line with our binding precedent, we apply de novo review. *See Souter*, 395 F.3d at 584, 590–97 (applying de novo review).

staying. Davis and three other men were waiting outside the apartment when Monday and Avery arrived. Once all six men were inside the apartment, Monday asked Avery "to beat Marsha up." Avery refused because he knew her too well. As a result, Davis and the other men began beating Blakely themselves. During the assault, a man known as Shakeme [John Edwards] repeatedly asked Blakely, "Where's my shit at?" Avery assumed that he was referring to money or drugs.

Blakely tried to defend herself, and in the process she hit one of the men, Lenworth Edwards, in the face. Edwards grabbed his nose, which was bleeding, and stepped away, but the other three kept on beating her until she was unconscious. Davis then grabbed Blakely by the arm and dragged her, face down, to a car in the parking lot. Edwards and two others got into the car with Blakely and Davis, while Avery and Monday got into a second car. The two cars were driven to an alley behind Westgate Plaza, where a man known as Justice was waiting in a third car. Blakely was dragged out of the car. Justice began swinging a shiny object at Blakely. Fearing for his life, Avery ran away.

*Davis*, 1996 WL 121998, at * 1–2. In addition to Avery, the state's case included several other witnesses. Most notably were the pathologist who conducted Blakely's autopsy; the girlfriend of one of Davis's codefendants, Delphina Guice; Detective Taliano; and an Ohio Bureau of Criminal Identification ("BCI") serologist.

The pathologist described Blakely's many injuries. He also noted that leaf fragments were found on Blakely's lower back, under her clothing and stuck to her skin.

Guice testified that on the night of Blakely's murder, she lent her car to her boyfriend, Lenworth Edwards, at around 10:00 p.m. and that he brought it back at 4:00 or 5:00 a.m. the next morning. She said that he was with someone named "Justice" when he picked up the car. And she stated that when Edwards returned he "kept saying" to her that he was with Guice during the time that he was out with her car, even though he was not with her. Guice testified that when she learned of Blakely's murder she became scared and decided to talk to the police, at which time she gave them a bag of Edwards's clothes.

Detective Taliano testified that the bag of clothes Guice provided included a blue jean jacket that appeared to have blood on the front chest area. Detective Taliano sent the jacket to BCI for lab testing. BCI serologist Dale Laux testified that he compared the blood on the jean jacket to samples from Blakely, Epps, and Lenworth Edwards. Laux explained to the jury that

the blood on the jacket could have originated from Edwards and that the blood stains were consistent with a nosebleed.

Detective Taliano testified that sometime after he received the report about the blood on Edwards's jacket, Avery came forward and met with him. He explained that Avery told him about Blakely's assault and that he was convinced Avery was telling the truth because his story was consistent with evidence not disclosed to the public. Detective Taliano highlighted those consistencies: the blood evidence from the jacket Guice provided (which corroborated Avery's description of the fight in Epps's apartment) and the leaf fragments found on Blakely's lower back (which corroborated Avery's account of Davis's having dragged Blakely's unconscious body across a grassy area).

Davis's defense was that he was not in Lorain, Ohio on the night of the murder. His girlfriend testified that he left Lorain on August 2nd and that she did not see him on August 8th or 9th. Lenworth Edwards testified that he did not see Davis between the beginning of August until around August 13th. Finally, Davis took the stand in his own defense and insisted that he was in New York on August 8th and did not return to Lorain until August 11th or 12th. He testified he had never met Blakely or Epps and denied assaulting or killing Blakely.

In addition to this trial evidence, we must also consider the evidence on which Davis's innocence showing relies—Avery's recantation. In his 2006 affidavit, Avery claimed he "never witnessed the murder of Marsha Blakely" and was not with the defendants on the night she was murdered. Doc. 1-2, Avery Affidavit, Page ID# 104. He also stated that he had "never been to Floyd Epps'[s] apartment" and that he "made up the story of what happened in the apartment, based upon the pictures" of the apartment that the police had shown him. *Id.* at Page ID# 104, 106. Finally, Avery asserted that before Davis's and his codefendants' trials he told prosecutor Rosenbaum that he was lying about what happened to collect reward money and that Rosenbaum told Avery that "if these dudes don't go down for this, that [Avery] would." *Id.* at Page ID# 106–07.

And last, we must consider the evidence revealed since Avery's 2006 recantation—namely the *Cleveland* Evidentiary Hearing, a full-day evidentiary hearing held in December

2013, during which Cleveland and the warden presented evidence. Much of that evidence focused on the veracity of Avery's trial testimony versus that of his recantation.

During this hearing, Davis took the stand and admitted his drug-dealing relationship with Cleveland and his involvement in selling and transporting drugs to the Lorain area. Detective Resendez explained that he first spoke with Avery about the Blakely murder on September 11 and took pictures of the apartment for the first time a week later. He denied having shown Avery photographs of Epps's apartment before questioning him, and the warden entered into evidence a police report that corroborated his testimony that the pictures did not exist at that time. Detective Taliano testified that he verified Avery's eleventh-hour claim that he witnessed Blakey's second assault by interviewing Charlotte Watkins, Avery's girlfriend to whom Avery admitted witnessing the murder. The warden entered into evidence Detective Taliano's notes showing that Watkins corroborated that Avery told her he had been present when Blakely was murdered. Detective Taliano also testified that the polygraph that the police gave Avery after his initial interview suggested that he had been truthful in describing everything except the fact that Cleveland dropped him off at home after the fight in Epps's apartment. Finally, former prosecutor Rosenbaum denied Avery's statement that he recanted before the trials and that Rosenbaum threatened to prosecute Avery for the murder.

In the context of all the evidence, including that presented at Davis's trial and the *Cleveland* Evidentiary Hearing, Avery's recantation does not convince us "that it is more likely than not that no reasonable juror would have found [him] guilty beyond a reasonable doubt." *Schlup*, 513 U.S. at 327. Though Avery's trial testimony was the primary evidence linking Davis to Blakely's murder, the jury apparently found it credible even after hearing about how Avery had recanted once before under oath, only later to rescind that recantation. And the jury reached this conclusion despite being told about other changes in Avery's statements too, including that his first story involved Cleveland dropping him off after the assault, that his second story included Cleveland returning after the murder and telling Avery what happened, and finally, according to his eleventh-hour admission, that Avery witnessed the murder. The jury also sat through extensive direct and cross examination about Avery's opportunistic behavior, financial incentives to testify, and drug-related history. As the magistrate judge wrote,

"the Court can say with certainty that the jury heard a great deal of evidence and testimony regarding Avery's credibility and alleged lack thereof." Yet the jury still credited Avery's testimony implicating Davis.

Avery's recantation amounts to another change in his story. This alone could make it more difficult for a reasonable juror to find it reliable. *Cf. Turner v. Romanowski*, 409 F. App'x 922, 930 (6th Cir. 2011) ("[A] reasonable juror would find it difficult to find [trial witness's recantation] affidavit credible because either he is lying now or he was lying then."). The hypothetical juror trying to determine which of Avery's stories was truthful would likely look to the corroborating evidence, as did the jury that heard Avery's trial testimony. So, we turn to the corroboration now.

Detective Taliano testified that he found Avery's eyewitness account given at trial credible because it was consistent with other information the detectives had collected that Avery "couldn't possibly have gotten from either the street or any reports . . . in the papers." Doc. 12-6, Trial Transcript, Page ID# 2104. Key to corroborating Avery's trial testimony is Lenworth Edwards's bloody jacket. As Detective Taliano explained to the jury, Avery's description of Blakely having struck Lenworth Edwards in the face was important because it was consistent with blood analysis revealing that the blood on the chest area of Edwards's jean jacket was consistent with Edwards's and that the angle in which the blood reached the jacket (straight down from above) was consistent with a nosebleed. This bloody jacket was non-public information. Yet during Avery's first interview, he identified Blakely as having struck in the face *the very defendant whose jacket had a blood stain on it consistent with a nose bleed*.

Davis contests the corroborating value of this evidence. He suggests that because the police knew that the blood on Edwards's jacket was his own, they could have fed this detail to Avery. But Davis's allegations of police misconduct are unpersuasive, as he has presented no evidence to substantiate them.[8]

---

[8]We also note that the district court that conducted the *Cleveland* Evidentiary Hearing found that the detectives "credibly testified they had not divulged" corroborating evidence to Avery before he made his statements. *See Cleveland*, 65 F. Supp. 3d at 542.

Nor does the transcript of Avery's first interview support Davis's allegations of police misconduct. Although the recording machine may have been turned off momentarily during Avery's interview, Avery had already begun telling the detectives about Edwards's injury at that point. Doc. 12-8, Avery First Interview, Page ID# 2683 (describing the struggle in Epps's apartment, explaining that Blakely was "[f]ighting back," and "[s]cratching, whatever she could do"); *id.* at Page ID# 2705 (describing that Lenworth "fell somewhere because he didn't get, he, he, he stalled for a minute cause I think he got . . ."). Shortly after Avery described this fight, the recording machine appears to have been turned off, *see id.*, while the detectives retrieved a photograph of the suspects, *see id.* at 2690, 2705, but importantly, when it was turned back on, Avery resumed describing the struggle consistently with his statement before the recording machine was turned off and explained that Blakely hit Edwards "hard enough to knock him back" and possibly "busted his nose." *Id.* at Page ID# 2705–06. Thus, Davis has not presented convincing evidence that Avery's pretrial statement about Edwards's injury was tainted.

Nor has Davis convinced us that Avery's pretrial statements about Edwards's injury should be discounted because they varied before trial. In both Avery's second interview and his deposition, he reiterated what he said in his first interview—that Blakely struck Edwards in his head region. *See* Doc. 12-8, Avery Second Interview, Page ID# 2791–93 ("I thought he got hit in the neck or his face"); Doc. 12-7, Avery Deposition, Page ID# 2322 (stating that Blakely struck Edwards "with her hand and fist . . . [a]bove his shoulders like somewhere"). Though Avery did not use identical phraseology all three times, he remained consistent on the material facts—Blakely struck Edwards in the head area, which evidently also influenced the jury to find Avery's trial testimony to be credible. Thus, Davis has not undermined the corroborative effect of Edwards's bloody jacket.[9]

The second piece of important corroborating evidence presented at Davis's trial was the pathologist report revealing that a "grassy substance" was found under Blakely's clothes and attached to her skin. The pathologist's findings corroborated Avery's initial story because Avery

---

[9]That no blood was in Epps's apartment, Appellant's Br. at 34–35, also does not show that Avery's description of Edwards's injury is uncorroborated. A reasonable jury could find, consistent with other evidence, that Edwards's jacket caught the blood.

described Davis's having dragged Blakely's unconscious body out of the apartment over a grassy or leafy area. Though a seemingly minor detail at first, the existence of the leafy substance under Blakely's clothes turned out to be significant because it made Avery's testimony about her having been dragged more likely to have been truthful.

Davis disputes the corroborative effect of the foliage found on Blakely's body. He argues that foliage could have gotten in Blakely's pants any number of ways, as "Blakely's body was found outside, in an area where . . . foliage was present." Appellant's Br. at 37. But the presence of foliage in the area where Blakely's body was found provides no explanation for how it ended up inside Blakely's buttoned-up pants. Avery's description of Davis's having dragged Blakely through a grassy area does: the foliage slid underneath Blakely's pants while she was pulled along the ground. Thus, the consistency between the presence of foliage underneath Blakely's clothes and Avery's testimony about Davis's having dragged her still makes it more likely that Avery's testimony was truthful.

In addition to these two pieces of corroborating evidence presented at trial, more corroborating evidence was uncovered during the *Cleveland* Evidentiary Hearing. First, the hearing revealed additional circumstantial evidence tying Davis and his drug-dealing group to the crime, including corroboration of the motive that Avery discussed in his trial testimony. *See House*, 547 U.S. at 540 (emphasizing that when a jury must decide who committed the crime, "motive is key"). During the *Cleveland* Evidentiary Hearing, Davis admitted associating with Cleveland and having trafficked drugs from Jamaica–Queens, New York to Lorain, Ohio. Detective Taliano testified that before Avery came forward, the police quickly identified this Queens, New York trafficking group as suspects in Blakely's murder. The police discovered that the car involved may have belonged to Guice, Lenworth Edwards's girlfriend. When they spoke with Guice, she admitted that she had loaned her car to Lenworth Edwards during the time of the murders, and she turned over Lenworth Edwards's bloody jacket. Guice also told the detectives that Blakely might have stolen some drugs from the New York drug dealers. This circumstantial evidence tends to corroborate Avery's initial interview and trial testimony that the defendants assaulted Blakely because she owed them money or drugs. Guice's having loaned her car to

Edwards the night of the murder also corroborates Avery's statement that the defendants had Guice's car that night.

Then there is the polygraph given to Avery after his first police interview. The test indicated that Avery was being dishonest about only one point: that he went home after the assault and did not witness Blakely's murder. That the polygraph questioned only the end of Avery's initial account (which he later admitted was a lie) is significant because according to Avery's recantation, he fabricated the *entire* story, including that he witnessed the assault in Epps's apartment.

The *Cleveland* Evidentiary Hearing also provided important corroborating evidence of Avery's eleventh-hour admission that he saw Blakely's second assault and murder. The day after Avery admitted that he was present during Blakely's murder, Detective Taliano verified Avery's admission by interviewing Charlotte Watkins, in whom Avery said he confided about having had witnessed the murder. Watkins corroborated what Avery told the detectives. Detective Taliano asked her if she ever had a conversation with Avery after Blakely's murder, and if so, what he told her. She stated that about four days after the murder, Avery told her that he had been at the crime scene and saw somebody stab Blakely.[10]

In addition to these additional pieces of corroborating evidence, the *Cleveland* Evidentiary Hearing shed light on the discrepancy between the detectives and an assertion made in Avery's affidavit. Avery declared that the police showed him pictures of Epps's apartment during his first interview and asked him "to describe what happened in the apartment" and that he "made up a story . . . based upon the pictures." The detectives have maintained that they showed no pictures of Epps's apartment to Avery. At the hearing, Detective Resendez reiterated this position on the stand. And his testimony was corroborated by the police report from Blakely's murder investigation, which confirmed that the police took the pictures of Epps's apartment on September 18, 1991, *a week after Avery's first interview*. This undercuts Avery's assertion that he used these pictures to "make up" his eyewitness account. This also strongly

---

[10]Davis argues that Watkins could have lied when she corroborated Avery's story. But Davis's speculation goes to only the weight of this corroborating evidence. That Watkins confirmed that Avery told her he witnessed Blakey's murder still makes it more likely that Avery's trial testimony was truthful.

suggests another falsity in the affidavit:  that Avery had "never been to" Floyd Epps's apartment. His ability to describe the apartment when relaying the details about the assault makes it more likely that this statement too was false.  *See, e.g.*, Doc. 12-8, Avery First Interview, Page ID# 2684, 2687 (explaining that the apartment had two doors and that when you "walk through the door, you see a bed over here . . . A table right there"); *id.* at Page ID# 2687 (describing the sidewalk layout); *id.* at 2690 ("Floyd's door is over towards the end.").[11]

Given the evidence that corroborates Avery's trial testimony, we find that Avery's affidavit does not create a credible claim of innocence.  Considering, among other things, "how the . . . likely credibility of the affiants bear[s] on the probable reliability of [new] evidence," *House*, 547 U.S. at 537, we conclude that Avery's recantation is not reliable.  Avery claims he made the entire story up at trial.  He now insists he was not present for Blakely's assault or murder.  But his allegedly fabricated story has more corroboration than his recantation—by physical evidence, a polygraph, and his girlfriend's statement that he admitted to her that he witnessed Blakely's murder.  In addition, a non-Avery witness has corroborated the same motive that Avery provided during his pretrial interviews and on the stand.  And one important part of his recantation—that he had never been to the scene of the crime and made up the story based on pictures—has been called into doubt.  On this record, we cannot say that it is more likely than not that no reasonable juror would be convinced of Davis's guilt beyond a reasonable doubt.

We recognize that the circumstances of Avery's recantation—that he came forward at first of his own accord and has not since rescinded his recantation—provide some basis for finding the affidavit reliable.  But even in recanting, Avery has provided differing stories.  When he went to the FBI, he claimed that his father had committed the murders and he never mentioned prosecutor Rosenbaum's having pressured him to testify.  In his affidavit, he omitted mention of his father's alleged role in the murder and he added details about being pressured by prosecutor Rosenbaum to testify untruthfully.

---

[11]Former prosecutor Rosenbaum also testified at the hearing and denied the allegation in Avery's 2006 affidavit that Avery told Rosenbaum he was lying for money and that, in return, Rosenbaum threatened to prosecute Avery for the murder.

Avery has also never recanted in open court.  He has never subjected his recantation to cross-examination.  And he has refused to subject himself to any adverse consequences.  *See Allen v. Yukins*, 366 F.3d 396, 405–06 (6th Cir. 2004) (holding that the district court "correctly concluded that [affiant's] affidavit was inherently suspect because [he] could have signed the affidavit in order to help his codefendant . . . without endangering his own interests").

Davis contends that the result we reach today contradicts our court's holding in his codefendant's case, *Cleveland v. Bradshaw*, 639 F.3d 626 (6th Cir. 2012).  There, a panel of this court found that Cleveland presented a credible claim of innocence entitling him to equitable tolling of the statute of limitations.  *Id.* at 642.  But this court's decision in *Cleveland* is distinguishable.  Cleveland presented several important pieces of exculpatory evidence that Davis lacks, and the *Cleveland* court lacked several pieces of corroborating evidence that we now have before us.

The *Cleveland* court based its decision on the cumulative effect of "four 'particularly relevant' items of additional evidence that, *when considered together* with the record as a whole, present[ed] a compelling case for Cleveland's innocence."  *Id.* at 635 (emphasis added).  In addition to Avery's 2006 recantation affidavit, Cleveland presented (1) an affidavit from a forensic scientist revealing that Blakely's blood was found on a piece of rubber at the Epps murder scene; (2) the affidavit of an alibi witness in which he stated that he encountered Cleveland in New York between 10 p.m. and 12 a.m. on August 7, 1991, and (3) flight records from New York City to Cleveland, Ohio on the night of Blakely's murder.  *Id.* at 635–36.  These three other pieces of evidence were probative of Cleveland's alibi—that he was in New York when Blakely died.  Cleveland argued that the forensic scientist's affidavit showed that Blakely died before Epps, thus shortening the timeframe for when she could have been killed.  *See id.* at 636–37 ("This would shorten the time of death for Blakely from sometime between 12 a.m. and 3 a.m., as the medical examiner testified at Cleveland's trial, to between 12 a.m. and 1:25 a.m.").  The affidavit from an alibi witness and the flight records provided what seemed at the time to be a credible alibi for Cleveland that, if believed, would have discredited Avery's prior statements because they showed that Cleveland was in New York when Blakely was murdered.  *Id.* at 641–42 (relying in part on "evidence that Cleveland was in New York a couple of hours before

Blakely's murder and could not have flown from New York to Ohio in time to commit the murder"). Davis has not presented similar, reliable alibi evidence.**12** Thus, the court's conclusion, that Cleveland's evidence showed more likely than not that no reasonable juror would have convicted Cleveland, does not apply equally here. *See id.* at 642.

In addition, when this court found Avery's 2006 recantation affidavit to be reliable, it did not have before it the testimony and evidence developed at the *Cleveland* Evidentiary Hearing. That hearing occurred on remand in Cleveland's case, and after it, the district court found that Avery's trial testimony was "not actually false." *Cleveland*, 65 F. Supp. at 523 (citation and internal quotation marks omitted). With the benefit of the *Cleveland* Evidentiary Hearing, we too find Avery's affidavit unreliable and thus insufficient to support Davis's innocence.

In sum, Davis has not undermined the evidence that corroborates Avery's trial testimony, and his only proof of innocence, Avery's recantation affidavit, is unreliable and, in the circumstances, insufficient to establish that he is innocent. The actual-innocence exception is "an important, though extraordinary, remedy, one that we refuse to provide in a less-than-extraordinary case." *McCray*, 499 F.3d at 577 (internal citation and quotation marks omitted). As set forth above, our application of the AEDPA standards to this case leads us to conclude that Davis is not entitled to habeas relief. He failed to file his habeas petition within the one-year statute of limitations period, and he is not entitled to an actual-innocence exception from the time limit because he has not presented sufficient proof of actual innocence for Avery's recantation to be a gateway to reversal of his conviction. Thus, we decline to resurrect Davis's time-barred habeas petition.**13**

---

**12**Davis proffers his brother's telephone bill, which shows a telephone call on the day of Blakely's murder, from Davis's brother's phone in New York to Davis's girlfriend Florence Michelle Brooks in Lorain, Ohio. But the call was made at 1:23 p.m., at least eight and a half hours after Blakely's murder. Thus, even if it were Davis who made this call from New York, he had ample time to travel there after the murder to do so. Compare this with Cleveland's alibi evidence, which, if credible, showed that he could not have been in Lorain when Blakely was allegedly murdered: "an affidavit from [an alibi witness] declaring that he met with Cleveland in New York between 10:00 p.m. on August 7, 1991, and 12:00 a.m. on August 8, 1991; and . . . flight records demonstrating that the last flight from New York City to Cleveland on August 7, 1991, departed at 10:40 p.m." *Cleveland*, 693 F.3d at 636.

**13**Because the evidence convinces us that Davis cannot establish a credible claim of actual innocence, we need not address his appeal of the district court's ruling on his motion for discovery. *See Bracy v. Gramley*, 520 U.S. 899, 908–09 (1997) (holding that discovery is appropriate when "specific allegations before the court show

III.

For the reasons set forth above, we AFFIRM the judgment of the district court.

---

reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief" (citation and internal quotation marks omitted)); *Turner v. Romanowski*, 409 F. App'x 922, 930 (6th Cir. 2011) (denying further fact development because "the record refutes [petitioner's] factual allegations or otherwise precludes . . . relief." (citation and internal quotation marks omitted)).